## CONTINENTAL ORE CORPORATION
### v.
### The UNITED STATES.
### Nos. 258-68, 259-68.

United States Court of Claims.
March 20, 1970.

---

Ralph A. Gant, New York City, attorney of record, for plaintiff.

Steven L. Cohen, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

DURFEE, Judge.

These two cases, which involve the same question of law, were consolidated for oral argument. Both sides are moving for summary judgment.

Plaintiff entered into two contracts, commonly known as C. & F. contracts, with the Commodity Credit Corporation ("C.C.C."). A C. & F. contract is one in which the seller pays cost and freight to a named destination. Commodity Export Contract OBS–AID–65–83 is the contract involved in Ct.Cl. No. 258–68. This contract was entered into by the parties in May 1965, and called for delivery of certain quantities of urea fertilizer to Vietnam. Simultaneously with the signing of this contract, plaintiff entered into a contract with a supplier in Taiwan to supply the fertilizer. Ct.Cl. No. 259–68 involves Commodity Export Contract OBS–AID–65–80, entered into in April 1965. This contract called for the delivery of cement to Vietnam; once again plaintiff entered into a contract with a Taiwan supplier to supply the cement. The contracts in each case stated that the procurements were authorized by the Agency for International Development ("A.I.D."), and that A.I.D. would transfer to C.C.C. dollars in an amount equal to the total exchange value of the material which was delivered and accepted by A.I.D. Plaintiff was to be compensated with agricultural commodities from C.C.C. inventory or reimbursement for vegetable oils it acquired from U.S. free-market stocks. The Taiwan supplier in each case shipped the goods with States Marine Lines, Inc. On or about May 28, 1965, the shipping line imposed war risk surcharges.

The Taiwan suppliers notified plaintiff that further shipments would be discontinued if the surcharges were not paid by plaintiff or C.C.C. Plaintiff thereupon requested C.C.C. to pay these surcharges, but C.C.C. refused. Plaintiff

**1250**

then paid the $110,050.18 in surcharges assessed on the urea fertilizer shipments, and it was billed $370,950.00 on the cement shipments, which amount remains unpaid.

Plaintiff appealed the decisions by the contracting officer, which were to the effect, in both cases, that C.C.C. was not liable for war risk surcharges assessed by ocean carriers, to the Contract Disputes Board for the Commodity Credit Corporation (hereinafter "the Board").[1] The Board, after considering the nature of war risk surcharges, denied plaintiff's appeal. Plaintiff is now suing under Section 2 of the Wunderlich Act, 41 U.S. C. § 322 (1964), and is contending that as a matter of law, war risk surcharges imposed by the carrier are to be borne by the buyer under a C. & F. contract.

■ As we have stated, a C. & F. contract is one in which the seller pays cost and freight to a named destination. The word "freight" is a word of art. "* * * Generally, in marine contracts the word 'freight' is used to denote remuneration or reward for carriage of goods by ship, rather than the goods themselves. * * *" The Bill, 55 F.Supp. 780, 783 (D.Md.) aff'd per curiam, 145 F.2d 470 (4th Cir. 1944). It refers to the compensation which the shipowner receives for carrying the goods.

Plaintiff insists, however, that "freight" does not include *all* transportation costs. In connection with this, the Board found that war risk surcharges are not considered as part of the "freight" by the maritime industry, but it is considered part of the cost of "transportation."

In our opinion, whether these surcharges are "freight" or "transportation" is not important; what is important is whether war risk surcharges are in that category of costs which are allocated to a seller under a C. & F. contract.

The seller's duties under this type of contract have been described by Williston as follows:

\* \* \* \* \* \*

Seller must

(1) provide and pay for transportation to named point of destination;

(2) pay export taxes, or other fees or charges, if any, levied because of exportation;

(3) obtain and dispatch promptly to buyer, or his agent, clean bill of lading to named point of destination;

(4) where received-for-shipment ocean bill of lading may be tendered, be responsible for any loss or damage, or both until the goods have been delivered into the custody of the ocean carrier;

(5) where on-board ocean bill of lading is required, be responsible for any loss or damage, or both, until the goods have been delivered on board the vessel;

(6) provide, at the buyer's request and expense, certificates of origin, consular invoices, or any other documents issued in the country of origin, or of shipment, or of both, which the buyer may require for importation of goods into country of destination and, where necessary, for their passage in transit through another country.

\* \* \* \* \* \*

2 Williston on Sales, § 280n (rev.ed. 1948).

It is interesting to note, at first, that Williston includes *"transportation* to named point of destination" in the obligations of seller under a C. & F. contract. In addition, it is apparent that while the seller's obligations cover cost of carrying the goods to the agreed destination, it is only responsible for damage to the goods until they have been delivered into the custody of the ocean carrier or until they have been delivered on

1. Contract OBS–AID–65–83 was the subject of Appeal No. 155; Contract OBS–AID–65–80 was the subject of Appeal No. 156.

board. On the other hand, the buyer must:

  \*   \*   \*   \*   \*   \*

(1) accept the documents when presented;

(2) receive goods upon arrival, handle and pay for all subsequent movement of the goods, including taking delivery from vessel in accordance with bill of lading clauses and terms; pay all costs of landing, including any duties, taxes, and other expenses at named point of destination;

(3) provide and pay for insurance;

(4) be responsible for loss of or damage to goods, or both, from time and place at which seller's obligations under (4) or (5) above have ceased;

(5) pay the costs of certificates of origin, consular invoices, or any other documents issued in the country of origin, or of shipment, or of both, which may be required for the importation of goods into the country of destination and, where necessary, for their passage in transit through another country. *Ibid.*

■ Looking at both sets of obligations together, it is clear that the seller, in a C. & F. contract, is responsible for getting the goods alongside or on the ship free of damage, and for paying to carry the goods to the foreign port with a clean bill of lading. Once the goods have been delivered safely alongside or on the ship, the buyer is responsible for loss or damage thereafter. Once the goods have arrived at their destination, the buyer is responsible for all costs of further movement of the goods.

With this in mind, we must next examine war risk surcharges themselves. They are additions to the cost of carrying goods, and were imposed in this case (as stated by the carrier) to cover: (1) increased war risk insurance premiums on vessel hull insurance, (2) crew bonus-es for entering the Vietnamese war zone, and (3) operating expenses during the extensive delays caused by severe congestion in the port of Saigon, where the goods were unloaded. Plaintiff takes no exception to the carrier's characterization of the purposes for which the war risk surcharges were imposed, *i. e.,* that they are to compensate the carrier. Instead, it contends that war risk surcharges, being similar to war risk insurance, should be borne by the buyer. However, a comparison of the purposes for the war risk surcharges here and war risk insurance shows this comparison to be false.

■■ Although both war risk insurance and war risk surcharges by definition arise because of war conditions, they are meant to protect or compensate different parties. Once the goods have been delivered alongside the ship, "\* \* \* under a c. & f. price the mercantile understanding is that the seller fulfills his duty on shipment of the goods and that the risk thereafter is upon the buyer, unless other terms of the contract indicate a contrary intention." *Id.* at § 280h. Thus, to protect the *goods* themselves, the buyer, bearing the risk, must take out insurance. War risk insurance is just one special kind of insurance, but its purpose is the same as regular insurance. On the other hand, war risk surcharges are imposed by the carrier, and are not used to insure the goods, but to compensate for certain of the carrier's expenses. Since the seller, under a C. & F. contract, bears the cost of carrying the goods to the port of destination, it is clear that it, and not the buyer, should bear these surcharges.[2] Thus, despite what may be similarities between war risk surcharges and war risk insurance, their different functions dictate different allocations.

In their briefs, and during oral argument, both parties contended that the

---

**2.** In the case of Tsakiroglou & Co., Ltd. v. Noblee & Thorl G.m.b.H., [1961] All E.R. 179 (H.L.), the House of Lords, in deciding that under a C.I.F. contract a longer route necessitated by the closing of the Suez Canal did not frustrate the contract, recognized that the resulting surcharges were the responsibility of the seller.

Uniform Commercial Code ("the U.C. C.") supported their respective positions. Although the application of the U.C.C. does not govern our case, it does furnish further evidence that it is the seller's responsibility for war risk surcharges. Section 2–320 deals with C.I.F. and C. & F. terms, and states as follows:

(1) The term C.I.F. means that the price includes in a lump sum the cost of the goods and the insurance and freight to the named destination. The term C. & F. or C.F. means that the price so includes cost and freight to the named destinations.

(2) Unless otherwise agreed and even though used only in connection with the stated price and destination, the term C.I.F. destination or its equivalent requires the seller at his own expense and risk to

(a) put the goods into the possession of a carrier at the port for shipment and obtain a negotiable bill or bills of lading covering the entire transportation to the named destination; and

(b) load the goods and obtain a receipt from the carrier (which may be contained in the bill of lading) showing that the freight has been paid or provided for; and

(c) obtain a policy or certificate of insurance, including any war risk insurance, of a kind and on terms then current at the port of shipment in the usual amount, in the currency of the contract, shown to cover the same goods covered by the bill of lading and providing for payment of loss to the order of the buyer or for the account of whom it may concern; but the seller may add to the price the amount of the premium for any such war risk insurance; and

(d) prepare an invoice of the goods and procure any other documents required to effect shipment or to comply with the contract; and

(e) forward and tender with commercial promptness all the documents in due form and with any indorsement necessary to perfect the buyer's rights.

(3) Unless otherwise agreed the term C. & F. or its equivalent has the same effect and imposes upon the seller the same obligations and risks as a C.I.F. term except the obligation as to insurance.

\*    \*    \*    \*    \*    \*

As can be seen, subparagraph 2(c) allows the seller in a C.I.F. contract to pass on the cost of war risk insurance to the buyer. Moreover, Comment 3 to § 2–320 states:

The insurance stipulated by the C. I.F. term is for the buyer's benefit, to protect him against the risk of loss or damage to the goods in transit. A clause in a C.I.F. contract "insurance —for the account of sellers" should be viewed in its ordinary mercantile meaning that the sellers must pay for the insurance and not that it is intended to run to the seller's benefit.

Thus, in a C.I.F. contract, where the seller is obligated to pay the regular insurance on the goods, the cost of war risk insurance can be passed on to the buyer. This is entirely consonant with the purpose for that insurance, i. e., that it is for the buyer's benefit. Additional guidance is furnished by a comment in Williston on Sales: "War risk insurance under this term [C.I.F.] is to be obtained by the seller at the expense and risk of the buyer." *Supra*, at § 280o. Just as war risk insurance is the responsibility of the buyer, because it is for his benefit, so war risk surcharges are the responsibility of the seller, because it is a charge for carrying the goods, for which the seller is responsible. Since C. & F. contracts are identical to C.I.F. contracts except for the insurance term, war risk surcharges are borne by the seller in C. & F. contracts as well.

■ Plaintiff further argues that the terms of the contract were ambiguous, and therefore, any ambiguities should be considered against the drafter, the Government. Specifically, plaintiff asserts

**1253**

that the ambiguity arose because the contract contained no provision allocating responsibility vis-a-vis war risk surcharges. However, there was no need to mention war risk surcharges specifically, since the C. & F. term, by itself, places the burden for paying for war risk surcharges on the seller. Any doubt which may have existed was due to plaintiff's misunderstanding of the U.C.C., and was not due to any ambiguity within the contract itself.

On June 28, 1965, A.I.D. issued Procurement Authorization and U.S. Government Agency Purchase Requisition No. 430–950–5014, which obligated funds "to cover anticipated increases in ocean freight costs due to the establishment of surcharges for cargo destined for Vietnam and due to freight increases in the regular freight rates."

Plaintiff cites this development as indicating that the Government itself was unsure as to whether surcharges had to be borne by it, or by the seller. However, the authorization may merely have been a precautionary measure, to allow for payment of the surcharges, had A.I.D. decided officially that the surcharges were its responsibility. Moreover, A.I.D., after considering a contract amendment, advised C.C.C. that there was no legal basis to justify amending the contract. As we have stated before, there is no ambiguity in the contract terms themselves to be construed against the Government, and the acts of A.I.D., in toto, do not show that they were confused as to the meaning of a C. & F. contract.

Plaintiff's argument that later contracts expressly placed the cost of surcharges on the seller does not prove that the contracts at issue were ambiguous. The Government, after seeing that some sellers were not aware that a C. & F. term required the seller to pay for war risk surcharges, may merely have wanted to prevent future litigation, and thus spelled out in greater detail what a C. & F. term entailed.

Since we have decided that plaintiff must bear the cost of the war risk surcharges, and cannot recover in the instant actions, we need not consider the argument which pertains only to Contract OBS–AID–65–80, the subject of Ct. Cl. No. 259–68. Plaintiff contended that the war risk surcharges for which it was billed had been paid into suspense accounts in Vietnamese banks by the Vietnamese importers, to be paid over to A.I.D. if plaintiff were successful in these suits. Accordingly, plaintiff argued, there was a constructive trust for plaintiff's benefit, and the Government could make payment without any cost to itself. The Government retorted that these funds could not be converted into dollars; hence, A.I.D. would require additional funds to pay plaintiff. However, all this is immaterial, since plaintiff is responsible for the surcharges.

For the foregoing reasons, plaintiff's motions for summary judgment are denied, defendant's cross-motions for summary judgment are granted, and the petitions are dismissed.