319 F.Supp. 821 (1970)
HELLENIC LINES, LTD., as owner of S.S. HELLENIC TORCH, S.S. HELLENIC STAR, S.S. HELLENIC SAILOR, S.S. HELLENIC GLORY and S.S. HELLENIC WAVE, Plaintiff,
v.
DIRECTOR GENERAL OF the INDIA SUPPLY MISSION For and on Behalf of the UNION OF INDIA, Defendant.
Nos. 64 AD 1000, 64 AD 1331, 66 AD 54.
United States District Court, S. D. New York.
November 30, 1970.
*822 *823 Kirlin, Campbell & Keating, New York City, for plaintiff; Edward L. Smith, William J. Crabtree, New York City, of counsel.
Baker, Nelson, Williams & Mitchell, New York City, for defendant; O. Taft Nelson, Robert M. Atkinson, Robert E. Meshel, New York City, of counsel.

OPINION
FREDERICK van PELT BRYAN, District Judge:
These three consolidated actions were tried before me without a jury.
Two of the actions arise out of two shipments of fertilizer from United States ports to Indian ports, for agencies of the Indian Government, aboard two vessels owned by plaintiff, Hellenic Lines, Ltd. (Hellenic). The third arises out of two similar shipments of fertilizer and one of rice aboard three other vessels owned by Hellenic.
Hellenic, a Greek corporation, which operated these vessels in the liner trade between the United States and India, seeks damages for detention of its vessels and lighterage charges in Indian ports. Defendant is the Director General of the India Supply Mission for and on behalf of the Union of India. All of the shipments involved were made pursuant to contracts of affreightment negotiated and made in the United States and under negotiable bills of lading issued by the carrier on sailings from Louisiana, Texas and Virginia ports.

I

The Voyages
A. Hellenic Torch. By a contract of affreightment dated December 26, 1963, Hellenic, as carrier, contracted to transport 5,000 metric tons of ammonium sulphate for the Indian Ministry of Transportation and Communications from the United States to India. The 4,929.3 long ton shipment was loaded aboard the S.S. Hellenic Torch (Torch) on January 19, 1964 at Galveston, Texas, destined for Bombay, and a bill of lading designating *824 the Regional Director (Food) as consignee was issued bearing that date.
The Torch was a general liner ship with cargo consigned to a number of consignees at various ports. The ammonium sulphate shipment was stowed in the Torch's lower hold beneath other general cargo of other shippers and consignees. The vessel sailed from Galveston and eventually reached Bombay, on April 16, 1964. Plaintiff's agents in Bombay, Shaw Wallace & Co. Ltd. (Shaw), requested the Bombay Port Trust (Trust), an autonomous body which operates and controls the Port of Bombay, to allot a berth so that the vessel could be discharged. The Trust advised Shaw that because of port congestion no berth was then available for the Torch and that the vessel would have to remain at anchorage and await its turn to be berthed. The congestion was caused by go-slow tactics of the Bombay dock laborers, which had held up the unloading of fertilizer and other types of cargo in the port.
On arrival, the Torch, through Shaw, had tendered a notice of readiness to discharge to the consignee. This was rejected by the consignee on the ground that the Torch was a general liner ship on full berth terms and that, as receivers of the cargo, the consignee was responsible only for taking delivery from a shoreside berth, pier or quay. Thereafter, Hellenic's agents requested the consignee to provide lighters to receive the fertilizer cargo while the Torch was at anchorage. The agents also requested the consignee to nominate an alternative port to which the Torch could proceed for discharge. These requests were also refused.
While the vessel was anchored, awaiting a berth, she began to load from barges cargo of other Bombay shippers. This continued for several days until April 24th when the Torch was allotted a berth. She continued loading other cargo while in berth for several days until April 28th and then returned to anchorage.
On May 27, 1964 discharge of the fertilizer cargo was begun into lighters while the vessel was still at anchorage, and this discharge continued on May 29th and 30th.
On June 1, 1964 a berth was again allotted by the Trust. The Torch berthed and commenced discharge. She completed discharge of all cargo consigned for Bombay, including the fertilizer shipment, on June 7th and sailed from Bombay on June 8th.
B. Hellenic Star. By a contract of affreightment dated March 10, 1964, Hellenic, as carrier, contracted with India Supply Mission, as shipper, to transport 2,000 tons of ammonium sulphate to Bombay. The terms were the same as those of the Torch contract. The shipment was loaded aboard the S.S. Hellenic Star (Star) at Houston, Texas, on April 15, 1964 and on-board bills of lading were issued bearing that date.
The Star was also a general liner vessel, with cargo consigned to a number of consignees at various ports. She arrived at Bombay on June 24, 1964, after calling at other ports. Shaw, Hellenic's agent, attempted to obtain a berth for the Star from the Trust and also hired stevedores for the discharge of the ammonium sulphate shipment. However, no berth was allotted for the Star, apparently owing to the same congestion prevalent when the Torch arrived, and the Star remained at anchor awaiting a berth until July 3, 1964. Shaw requested that defendant provide lighters to receive the fertilizer and this request was refused by the defendant on the same grounds as it asserted in the case of the Torch.
On July 3, the Star berthed at Victoria Dock, Bombay, and discharged general cargo but did not discharge any of the ammonium sulphate shipment. She sailed for Cochin and other ports on her itinerary[1] on July 4, to discharge and *825 load other cargo not connected with defendant.
Prior to sailing from Bombay, defendant agreed to accept delivery of the fertilizer shipment at the Port of Calcutta, to which the Star was to sail with other cargo, at no extra cost to the Government of India. Hellenic reserved its right to claim for any detention of the vessel at Bombay.
The Star arrived at Sandheads, a deep water anchorage off the Port of Calcutta, on August 13, 1964, after making the other stops on its itinerary. She berthed in the Port of Calcutta on August 18 to discharge both general cargo and defendant's fertilizer. Discharge of the fertilizer was completed on August 29, 1964.
After memorandum copies of the Star bills had been released, but before the original bills were exchanged for an outstanding negotiable mate's receipt, Hellenic added typewritten language to the face of the three originals of the bills of lading. The bills were dated and appear to have been issued on April 15, 1964, one day before the Torch arrived at Bombay, and the added language was apparently typed on the Star bills after the Torch had arrived there and Hellenic was fully aware of the congestion at that port.
C. Hellenic Wave, Hellenic Glory and Hellenic Sailor. Pursuant to a contract of affreightment dated November 19, 1963, and a bill of lading dated December 27, 1963, approximately 4,328 long tons of rice were shipped aboard plaintiff's S.S. Hellenic Wave (Wave), from Lake Charles, Louisiana, to Bombay. Under a contract of affreightment dated December 11, 1963 and a bill of lading dated January 6, 1964, 20,000 bags of nitrophosphate were shipped aboard the S.S. Hellenic Glory (Glory), from Norfolk, Virginia, to Bombay. Under a contract of affreightment dated October 15, 1963 and a bill of lading dated November 1, 1963, 56,000 bags of rice were shipped aboard the S.S. Hellenic Sailor (Sailor) from Houston, Texas to Bombay, India.
The terms of these three shipments, all for India Supply Mission as shipper, were identical and the same as the Torch and Star shipments. The vessels, upon arrival at Bombay, discharged by lighter.

II

Conditions at the Ports of Discharge
The Port of Bombay, including the Harbor and the adjoining estates, is operated and controlled by the Trust, an independent, autonomous body. It is not under the control of the defendant. Berths in the Port are allotted by the Trust. Cargo is customarily discharged into the custody of the Trust.
It is customary for liner ships carrying commodities of the type involved here, discharging at the Port of Bombay, to discharge at a shoreside berth, dock or quay. Fertilizer cargo is not customarily discharged into lighters.
When the Torch and the Star arrived at Bombay and while these vessels were awaiting allotment of berths by the Trust, a work slowdown by the general laborers in the Port area of Bombay was in progress. It is clear that this slowdown resulted in considerable port congestion, particularly with respect to fertilizer and feed grain cargoes. There is no evidence in the record that the slowdown was the result of any fault on the part of the defendant, nor did the defendant have any control over it. The delay of the Bombay Trust in allotting berths to the Torch and to the Star for the discharge of fertilizer cargo was the result of the port congestion caused by the slowdown.
In Calcutta, the Calcutta Port Commissioners, through their Docks Manager, arrange for the berthing of vessels according to the priority of arrival at Sandheads, a deep water anchorage off the Port, taking into account the nature of the cargo and other factors. Thus, order of arrival at Sandheads is not the *826 sole determinant of the order of berth allocation.

III

The Terms of the Freight Contracts and the Bills of Lading
The contracts of affreightment for all of the shipments involved in these cases contained the same terms. The relevant clauses of the contracts were as follows:
1. THIS SHIPMENT IS TO BE ON FULL BERTH TERMS AT BOTH LOADING AND DISCHARGING PORTS EXCEPT IN THOSE SPECIFIC RESPECTS PROVIDED HEREINAFTER.
* * * * * *
3. ALL DISCHARGE EXPENSES ARE FOR THE ACCOUNT OF THE VESSEL, CONSIGNEE WILL SUPPLY THE VESSEL AT ITS EXPENSE, BAGS AND TWINE ETC. ALL EXPENSES RELATIVE TO BAGGING, TWINING, STITCHING WILL BE FOR ACCOUNT OF RECEIVERS. IT IS UNDERSTOOD THAT RECEIVERS WILL TAKE RECEIPT OF CARGO AT THE RATE OF 750 TONS PER DAY, MINIMUM, OTHERWISE BERTH TERMS DISCHARGE.
* * * * * *
10. NO DEMURRAGE OR DESPATCH IS APPLICABLE AT EITHER LOADING OR DISCHARGING PORTS.
* * * * * *
17. CARRIER'S REGULAR FORM OF BILL OF LADING IS TO BE USED UNDER THIS CONTRACT AND BILL OF LADING SHALL ALSO CONTAIN THE FOLLOWING CLAUSE "ALL CONDITIONS AND EXCEPTIONS CONTAINED IN CONTRACT OF AFFREIGHTMENT * * * [contract number inserted] DATED [date inserted] AT [place inserted] ARE TO BE CONSIDERED AS EMBODIED IN CARRIER'S BILL OF LADING, AND IN CASE OF INCONSISTENCY BETWEEN ANY TERMS OF THIS CONTRACT AND ANY TERMS OF SAID BILL OF LADING THE CONTRACT SHALL CONTROL."
Each of the bills of lading specifically incorporated the terms of the freight contract.
The bills of lading also contained the following clause relating to discharge:
12. The Port Authorities are hereby authorized to grant a general order for discharging immediately on arrival of the ship and the carrier, without giving notice either of arrival or discharge, may discharge the goods directly they come to hand at or upon any wharf, craft or place that the carrier may select and continuously, Sundays and holidays included, at all such hours by day or by night as the carrier may determine, no matter what the state of the weather or custom of the port may be, * * *. All lighterage and use of craft in loading or discharging shall be at the risk and expense of the goods and shall be provided by shipper, consignee, receiver and/or owner of the goods. * * * If the vessel's loading or discharge is delayed through failure of shipper, consignee, receiver and/or owner of the goods to supply cargo, to furnish lighterage or use of craft or to deliver, receive or remove the goods or supply sufficient labor when the goods are to be loaded or discharged, free of expense to the vessel * * * the shipper, consignee, receiver and/or owner of the goods will pay for the detention of the vessel. * * * (Emphasis added.)
In the case of the Star, the following was the language added by Hellenic to the original bills of lading:
Consignees to arrange to receive cargo on arrival at or off Bombay, failing *827 which to pay detention according to Clause 12.
The freight contracts also contained a clause dealing with strikes at ports of discharge:
15. IN THE EVENT OF A STRIKE AT THE DISCHARGING PORT, THE OWNERS OF THE CARGO HAVE THE OPTION OF DESIGNATING AN ALTERNATIVE PORT OF DISCHARGE ON THE SAME COAST FOR WHICH AN ADDITIONAL FREIGHT * * * SHALL BE PAID * * * ASSUMING SAID DIVERSION IS ORDERED AFTER ARRIVAL AT THE DISCHARGE PORT SPECIFIED IN THE BILL OF LADING. IN THE EVENT ALL PORTS ON THE SAME COAST ARE STRIKEBOUND, THE OWNERS OF THE CARGO HAVE THE OPTION OF DESIGNATING ANOTHER PORT OF DISCHARGE NOT ON THE SAME COAST FOR WHICH AN ADDITIONAL FREIGHT * * * SHALL BE PAID * * * ASSUMING SAID DIVERSION IS ORDERED AFTER ARRIVAL AT THE DISCHARGING PORT SPECIFIED IN THE BILL OF LADING. THE OWNERS OF THE CARGO MAY EXERCISE THIS OPTION AT ANY TIME BEFORE THE VESSEL ARRIVES AT PORT LIMITS BUT IN THE EVENT THE VESSEL HAS ARRIVED AT THE PORT LIMITS THE CARRIER MAY REMAIN AT THE PORT OR REQUEST THE CONSIGNEE OR [sic] DESIGNATE AN ALTERNATIVE PORT. IF THE CARRIER SHOULD REQUEST AN ALTERNATIVE PORT THE CONSIGNEE MUST DESIGNATE THE PORT IN WRITING WITHIN 72 HOURS AFTER RECEIPT OF THE REQUEST. IF THE ALTERNATIVE DISCHARGE PORT IS NOT NOMINATED IN WRITING WITHIN 72 HOURS AFTER RECEIPT OF THE REQUEST THE MASTER MAY ACT IN ACCORDANCE WITH SUCH TERMS AND SUCH CONDITIONS OF THE CORRESPONDING BILL OF LADING AS MAY BE APPLICABLE IN THE CIRCUMSTANCES. * * *
16. THE PORT TRUST AUTHORITIES AT THE DISCHARGE PORT SHALL BE THE AUTHORITY TO DETERMINE AS TO WHETHER A STRIKE EXISTS FOR THE PURPOSE OF THIS CONTRACT.
The bills of lading contained the following clause concerning strikes at ports of discharge:
24. If, at any port discharge cannot be commenced immediately on arrival and/or continued normally owing to interdict congestion, closure of port, lack of lighters, bad weather, strikes, labor disputes or any other causes beyond the control of steamer or owners, the vessel is at liberty to discharge at any other safe and convenient port at Master's option. Such discharge at another port shall be considered as final delivery and full freight and charges shall become due.

IV

The Contentions of the Parties
In the Torch and Star cases, Hellenic first contends that under the terms of the bills of lading it was defendant's obligation, upon tender of delivery of the fertilizer cargoes at Bombay, and when it appeared that berths were unavailable, to receive the cargoes on lighters to be provided by the defendant at its own expense. Hellenic asserts that the failure of the defendant to furnish lighters when berths were unavailable resulted in the detention of these vessels at Bombay, for which the defendant is liable. *828 On this theory Hellenic claims damages of $100,139.90 for the detention of the Torch and $20,373.24 for the detention of the Star.
In the case of the Star, Hellenic also contends that the language which it added to the Star bill of lading placed upon defendant the obligation to receive the cargo upon its arrival at Bombay, regardless of conditions at the port and that defendant's failure to do so made it liable for the detention of the Star there.
In the case of the Torch, Hellenic contends, in the alternative, that under the terms of the strike clause in the freight contracts, defendant was required to nominate a substitute port within 72 hours after request by the vessel and that defendant's failure to do so was a breach of the contract of carriage which rendered defendant liable in damages for the detention of the Torch at the Port of Bombay after the 72 hours had expired. On this theory, Hellenic claims damages of $87,501.90.
In the case of the Wave, Glory and Sailor, Hellenic contends that, under the terms of clause 12 of the bills of lading, defendant is liable to pay the cost of lighters used in discharging the shipments at Bombay. Hellenic claims $20,467.20 as the amount it laid out for such lighterage.
Defendant denies any liability to Hellenic on the shipments involved in these cases.
Defendant maintains that under the full berth terms of the freight contracts and in accordance with custom at the Port of Bombay, the carrier was required to discharge cargoes at a portside berth; that defendant was in no way responsible for the failure of the vessels to obtain berths for discharge of the shipments at Bombay and that defendant's only obligation was to take receipt of cargo when discharged by the carrier at the rate of 750 tons per day, as the freight contracts provided, which it did. Defendant contends that clause 12 of the bills of lading imposed no obligation to take discharge of these cargoes on lighters. It maintains that such an obligation would be inconsistent with the terms of the freight contracts which govern. Finally, defendant asserts that even if clause 12 of the bills of lading did apply, it is in no way liable under this clause, since the clause was applicable only if discharge was to be free of expense to the vessel and here under the terms of the freight contracts all expenses of discharge were for the account of the vessel.
Defendant further contends that Hellenic had no right to add additional language to the Star bills of lading and that such language is in no way binding upon it.
Defendant denies that it was under any obligation to nominate alternative ports because of the slowdown of port labor at Bombay or that it is liable for failure to do so. Defendant contends that there is no showing in this record that a strike existed at Bombay within the meaning of the freight contracts, particularly since there was no determination by the Bombay Port Trust as to whether a strike existed as the contracts require. But even if there was a strike defendant contends that it merely had the option to designate an alternative port of discharge and that if it failed to exercise such option the master of the vessel had the ultimate option to select an alternative port under the bills of lading.
Finally, defendant contends (1) that under the terms of the freight contracts, plaintiff carrier was required to bear all expenses of discharge in Indian ports, including the cost of lighters, if utilized, and that it is therefore not liable for the cost of lighters, and (2) that in any event the no demurrage clause of the freight contracts bar any claims for detention.

*829 V

The Claims for Detention Based on Defendant's Failure to Furnish Lighters
The freight contracts for these shipments expressly provided that their terms were to be embodied in the bills of lading and in case of any inconsistency between the terms of the contracts and the terms of the bills of lading, the terms of the contracts control. This was plainly the intention of the parties and must be given effect. G. Gilmore & C. Black, Jr., The Law of Admiralty 195 (1957) (hereinafter Gilmore and Black). See, e. g., North. Pac. R. Co. v. Am. Trading Co., 195 U.S. 439, 25 S.Ct. 84, 49 L.Ed. 269 (1904); Son Shipping Co. v. Defosse & Tanghe, 199 F.2d 687 (2d Cir. 1952); The Titania, 131 F. 229 (2d Cir. 1904). See also, Poor on Charter Parties § 59 (1968).
The freight contracts provided that the shipments were to be on full berth terms at discharging ports; that all expenses of discharge were for the account of the vessel; and that the consignee-receiver's only obligation was to take receipt of the cargo at the rate of 750 tons per day "otherwise berth terms discharge."
All of these ships were general cargo liner vessels which carried a variety of cargoes for numerous shippers to a number of ports. In the case of such vessels, these terms of the freight contracts were generally understood in the trade and between the parties to mean that vessels at discharging ports were obligated to discharge at shoreside dock, pier or quay and in accordance with the custom of the discharging port, and that all expenses and responsibility of discharge (only excepting bagging) were on the vessel and not on the consignee-receiver. The only obligation placed on the consignee was to take receipt of the cargo when so discharged by the vessel at the minimum required rate.
This is clear from the testimony of defendant's witness Diamond, who was well qualified to testify on this subject and who negotiated the freight contracts on defendant's behalf. Diamond's testimony is entirely credible and virtually uncontradicted and I accept it.
Furthermore, this interpretation of the contracts of affreightment as applied to vessels such as these is entirely reasonable. With numerous and varied cargoes consigned to numerous consignees at a variety of ports, this is the only practical way in which such vessels could operate. It is only the vessel operator and not individual shippers or consignees who can work out the problems of discharge at particular ports, arrange discharging berths suitable for the cargoes' needs and determine the rotation in which the various shipments aboard the vessel are to be discharged. It is apparent from the record that this was the course followed by the vessels involved here. Moreover, according to the testimony, shoreside discharge of the fertilizer cargo was in accordance with custom in the Port of Bombay and this custom was considered to be a part of the contract of affreightment. See, Empire Trans. Co. v. Philadelphia & R. Coal & Iron Co., 77 F. 919, 921-922 (8th Cir. 1896); Melloy v. Lehigh & W. Coal Co., 37 F. 377 (S.D.N.Y. 1888).
Thus, under these contracts of carriage it was the responsibility of Hellenic's vessels to discharge at shoreside berths entirely at the risk and expense of the vessel. There was no obligation upon defendant to receive the fertilizer cargoes into lighters or to supply lighters for the discharge of these cargoes.
Hellenic's contention that defendant was required to supply lighters under clause 12 of the bill of lading is without merit. Even assuming the doubtful proposition that clause 12 of the bills, standing by itself, imposed such an obligation, this would be clearly inconsistent with the controlling terms of the freight contracts and thus would be of no force and effect.
Apart from this, however, it is plain that even if clause 12 applied, Hellenic *830 could have no claim against defendant for detention based on its failure to supply lighters for the discharge of these shipments. Clause 12 expressly provided that the consignee was liable for detention of the vessel because of "failure * * * to furnish lighterage or use of craft to * * * receive or remove the goods" only "when the goods are to be * * * discharged free of expense to the vessel." Here, under the express terms of the controlling freight contracts, discharge was to be entirely "for the account of" and not "free of expense to" the vessel.

VI

The Claim for Detention of the Torch for Failure to Nominate an Alternative Port
Clause 15 of the freight contracts dealing with the eventuality of a strike provided, in substance, that in the event of a strike at a discharging port, the owner of the cargo had the option of designating an alternative port of discharge for which specified additional freight was to be paid. It further provided that if the vessel had arrived at port limits, she might remain at the port or request the consignee to designate an alternative port and that if the consignee had not designated an alternative port within 72 hours after such request, the master could then act in accordance with the applicable terms of the bill of lading.
After her arrival at Bombay, the Torch requested defendant to designate an alternative port under the strike clause. Defendant did not do so. Hellenic claims that this was a breach of the strike clause which made defendant liable in damages for the subsequent detention of the vessel at Bombay.
Assuming, without deciding, that a strike within the meaning of the strike clause then existed at Bombay, the defendant is not liable under that clause for the detention of the Torch after defendant had failed to designate an alternative port.
When defendant failed to nominate an alternative port within 72 hours, under the strike clause in the freight contract, the master was entitled to act in accordance with the applicable terms of the bill of lading. Clause 24 of the bill provided that if discharge could not be commenced because of a strike or labor dispute, the vessel might, at the master's option, discharge at any other safe or convenient port and such discharge would be considered as final delivery to the consignee.
Thus, the master of the Torch was under no obligation to remain at Bombay after the defendant had failed to nominate an alternative port. He was free to discharge at any other safe and convenient port, if such a port was available. If such a port was available while the Torch was at Bombay as Hellenic claims, no reason has been advanced as to why the master of the Torch did not exercise his option to discharge there. There is, however, no evidence to support Hellenic's suggestion that the Port of Kandla or any other safe and convenient alternative port was available. If no such alternative port was available, then the defendant could not have made the nomination permitted under clause 15 of the contract and is not liable for failure to do so. In any event, the election to remain at Bombay after the 72 hours had expired, whether caused by the lack of an alternative port or by the master's choice to remain there and risk delay, was that of the vessel which, under the terms of the freight contract, bore responsibility for and risk of discharge.
Defendant contends that while there was some slowdown of port labor at Bombay, the evidence does not establish that there was a strike within the meaning of the freight contract and that therefore the strike clause was inapplicable. Defendant points out that under clause 16 of the freight contract the Bombay Port Trust was "the authority to determine whether a strike existed for the purpose of this contract." There is nothing in the record to indicate that the Trust ever made such a determination *831 or was called upon to do so. One witness testified that there was no strike. The evidence with respect to the nature, extent, effect, and details of the slowdown is not sufficient to resolve the question of whether the slowdown constituted a strike with any degree of assurance. However, it is unnecessary to decide the question in view of my holding that defendant is not liable for detention of the Torch under the strike clause, in any event.

VII

The No-Demurrage Clause
Clause 10 of the freight contracts provided that "no demurrage or despatch is applicable at either loading or discharging ports." This clause is entirely consistent with and adds force to the clauses of the freight contracts which place the responsibility of securing a berth and discharging the cargo upon the carrier. But more than this, the clause furnishes an additional ground for holding that defendant is not liable for the delays of Hellenic's vessels in these cases.
Demurrage is defined as extended freight and is the amount payable for delays by the receiver in loading or unloading cargo. It is stipulated damages for detention. Intercontinental Transportation Co. v. India Supply Mission, 261 F.Supp. 757 (S.D.N.Y. 1966); United States v. Atlantic Refining Company, 112 F.Supp. 76 (D.N.J. 1951); Bailey v. Manufacturer's Lumber Co., 224 F. 806 (S.D.N.Y. 1915); Gilmore and Black 186-188; Rene de Kerchove, International Maritime Dictionary 212 (2d ed. 1961); Scrutton on Charterparties 131 (17th ed. 1964). It is plain that when the parties choose, they may contract out of any liability for delay in discharge. See Continental Grain Co. v. Armour Fertilizer Works, 22 F.Supp. 49 (S.D.N.Y. 1938).
The no demurrage clause here clearly excludes any claims against the defendant for delay in berthing the vessels or discharging cargo, contractual or non-contractual. See The Apollon, 22 U.S. (9 Wheat) 362, 6 L.Ed. 111 (1824); Continental Grain Co. v. Armour Fertilizer Works, supra. See also Gilmore and Black 186; Kerchove, supra; Poor on Charter Parties §§ 35-58 (1968).
I find nothing in the record or in the decided cases which supports Hellenic's contention that its claims for delay here, characterized by it as claims for detention, are any different from demurrage or are not covered by the no-demurrage clause. In fact, it is not without significance that in the letter of Hellenic's agents making initial claim for the delay in unloading the Star at Bombay before she was diverted to Calcutta, it is stated that Hellenic is holding defendant "responsible for the demurrage incurred" at Bombay. (Emphasis added.)

VIII

The Added Clause in the Star Bills of Lading
Hellenic claims that the language which it added to the original Star bills of lading makes defendant liable for detention of that vessel at Bombay. The language so added purported to require the consignee to receive the cargo on arrival, failing which to pay detention. There is no merit to this contention.
Defendant quite properly urges that Hellenic could not so alter the contract of carriage unilaterally and that the added language is in no way binding upon it. There is no evidence to support Hellenic's suggestion that defendant impliedly consented to the addition of this language and thus can be considered bound thereby.
In any event, such language, even if permissibly added, is plainly inconsistent with the express terms of the freight contract and therefore is of no effect.

*832 IX

The Claims of the Wave, Glory and Sailor for Lighterage Expense
Hellenic's claim for the cost of the lighterage which it paid out in the discharge of the Wave, Glory and Sailor shipments requires little discussion.
Under the terms of the freight contracts, the responsibility of the vessel was to discharge at shoreside berths at the risk and expense of the vessel and all discharge expenses were for the account of the vessel. Clause 12 of the bills of lading to the effect that lighterage used in discharging should be at the risk and expense of the goods and should be provided by the consignee is plainly inconsistent with the terms of the freight contracts. The terms of the freight contracts therefore control and the provisions of clause 12 of the bills of lading relied on by Hellenic are of no effect.
Defendant was under no obligation to receive cargoes into lighters or to supply lighters for discharge and is not liable for the cost of lighterage used in the discharge of the Wave, Glory and Sailor.

X

Additional Claims
Hellenic does not now appear to press the claims it originally asserted that once the Torch was berthed at Bombay and the Star was berthed at Calcutta, defendant failed to take receipt of cargo at the minimum rate of 750 tons per day prescribed by the freight contracts and is liable in damages therefor. In any event, however, the evidence does not establish that defendant breached its obligation to receive cargo at this rate once the vessels were berthed, and is liable for damages on that account.
Since plaintiff has failed to establish any of its claims against the defendant, judgment will be entered dismissing the complaints in all three actions. The foregoing opinion constitutes my findings of fact and conclusions of law in these cases.
It is so ordered.
NOTES
[1] Colombo, Madras and Chittagong.