734 F.2d 1079
 1988 A.M.C. 303
 In the Matter of: COMMONWEALTH OIL REFINING COMPANY, INC., Debtor.
MINERALOLHANDELSGESELLS-CHAFT MBH AND COMPANY ("MEBRO"),
Plaintiff-Appellant,
v.
COMMONWEALTH OIL REFINING COMPANY, INC., Defendant-Appellee.
 No. 84-1052
 
 Summary Calendar.
 United States Court of Appeals,
Fifth Circuit.
 June 25, 1984.
 Beck & Beck, Lawrence A. Beck, Patricia A. Kalmans, San Antonio, Tex., for plaintiff-appellant.
 Michael R. Rochelle, Alice L. Nystel, Dallas, Tex., for defendant-appellee.
 Appeal from the United States Court for the Western District of Texas.
 Before BROWN, TATE and HIGGINBOTHAM, Circuit Judges.
 TATE, Circuit Judge:
 
 
 1
 This appeal arises from proceedings before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code, 11 U.S.C. Secs. 1121 et seq. The plaintiff ("Mineral") filed an administrative priority claim based upon demurrage that Mineral, the seller, had been required to pay on a cargo of naphtha delivered to the debtor ("Commonwealth") as buyer. The bankruptcy court disallowed substantially all of Mineral's demurrage claim, finding that the disallowed demurrage represented charges attributable to Mineral's fault. On Mineral's appeal, the district court affirmed.
 
 
 2
 Both parties concede that, in the absence of a contractual provision specifying liability, the party that caused the delay is responsible for the demurrage charges.
 
 
 3
 On its appeal to this court, Mineral, the plaintiff seller, contends (1) that, under the contract between the parties, the buyer Commonwealth was responsible for the demurrage, and (2) that, at any rate, the delays were caused by Commonwealth's delinquencies in several respects. Finding no merit to these contentions, we affirm.
 
 Factual Context
 
 4
 The telex-confected contract between Commonwealth as buyer and Mineral as seller concerned a shipload of naphtha already at sea on a vessel chartered by a third party, who also owned the naphtha. Mineral had offered to buy the cargo and resell it to Commonwealth, and Commonwealth accepted.
 
 
 5
 After the sale and resale, this third party charterer became liable to the vessel for demurrage charges, as contractually provided in the charter party between the vessel and this third party. The demurrage charges resulted from delays at the port of unloading due to inadequate documentation of the cargo. The seller Mineral, the assignee of the cargo under shipment from its owner (the third party charterer), reimbursed this charterer for these demurrage charges so incurred. Later, in the Chapter 11 reorganization proceedings of the debtor Commonwealth--the purchaser of the cargo--, the seller Mineral seeks recognition of Commonwealth's liability for charges.
 
 
 6
 In rejecting Mineral's claim, the trial court held that the demurrage delay resulted from Mineral's fault in providing inadequate documentation (a principal issue of this appeal). It did not expressly pass upon Mineral's contention (which we next address) that, under the contract between these two parties, the buyer Commonwealth was to be responsible for demurrage charges.
 
 Mineral's Contract Contention
 
 7
 The contract between the present parties, the buyer Commonwealth and the seller Mineral, did not in terms provide for liability as between them for "demurrage." Mineral relies, however, upon its interpretation of provisions of this contract as allegedly importing the buyer's liability for demurrage.[1] The contract provided that the seller was obligated to "pay freight charges and any charges for unloading at the port of discharge which may be levied by regular shipping lines at the time and port of shipment." (Emphasis added.) The buyer was to pay, "with the exception of the freight, all costs and charges incurred in respect of the goods in the course of their transit by sea until their arrival at the port of destination, as well as unloading costs, ... unless such costs shall have been included in the freight or collected by the steamship company at the time freight was paid."
 
 
 8
 By a rather strained construction of the contract, the seller Mineral contends that "demurrage" is a form of "freight" charges and that, since it was liable only for "freight" prepaid at the time of shipment, the buyer Commonwealth's liability for post-shipment "freight" also includes liability for demurrage charges as a form of "extended freight". Aside from the difficulty in construing the contract as imposing any liability for freight upon the buyer, Mineral's argument fails in several respects.
 
 
 9
 In the first place, despite the contract's incorporation by reference of a standard contract clause, from the record it does not appear that either party specifically agreed as between them to pay the freight. By an earlier contract between these parties, Commonwealth had agreed to buy naphtha from Mineral at so much per metric ton, and by agreement between the two, Commonwealth had purchased the cargo in question, then under shipment and owned by a third party, for a price that presumably compensated the cargo's owner (who was also the charterer of the cargo's vessel) for any freight charges for which the latter was liable.
 
 
 10
 In the second place, even assuming the parties contemplated charges for post-shipment "freight" for which the buyer would be responsible, we cannot discern any contractual intent that such liability would extend to "demurrage". Demurrage, it is true, is sometimes referred to as being a form of "extended freight", see notes 3 and 4, infra, and The Lake Galera, 60 F.2d 876, 879 (2d Cir.1932),[2] but this concept, while perhaps relevant in a controversy as to liability between a vessel and a consignee for demurrage charges (see note 2), has little significance with regard to the issue before us, which at most involves the intended meaning of liability for "freight" in a contract between a buyer and a seller of cargo, neither of them subject to a charter party nor a bill of lading that, as between them, attempted to regulate the liability for demurrage charges (i.e., that might be incurred under the charter party by the charterer in favor of the vessel for delays in unloading the cargo at point of destination).
 
 
 11
 The issue before us is, simply, whether under the contract between the buyer and the seller, the buyer's alleged liability for post-shipment "freight" was intended to include its liability for any post-shipment "demurrage" charges. However, in their ordinary meanings, the terms "freight" and "demurrage" denote different concepts:
 
 
 12
 Demurrage: "In maritime law, the sum which is fixed in the contract of carriage, or which is allowed, as remuneration to the owner of a ship for the detention of his vessel beyond the number of days allowed by the charter-party for loading and unloading or for sailing. * * * " Black's Law Dictionary, 389 (5th ed. 1979).[3] To the same effect, see Tver, Ocean and Marine Dictionary 93 (1979); deKerchove, International Maritime Dictionary 212-13 (2d ed. 1961);[4] Skou v. United States, 478 F.2d 343, 345 (5th Cir.1973) ("Demurrage [is the] loss of profits from the loss of use of a vessel").
 
 
 13
 Freight: "The price or compensation paid for the transportation of goods by a carrier. * * * " Black's Law Dictionary, supra, at 599. See also Continental Ore Corporation v. United States, 423 F.2d 1248, 1250 [191 Ct.Cl. 100] (1970) ("The word 'freight' is a word of art. 'Generally, in marine contracts the word "freight" is used to denote remuneration or reward for carriage of goods by ship, rather than the goods themselves.' ... It refers to the compensation which the shipowner receives for carrying the goods").
 
 
 14
 In construing the contractual obligations of the parties, we cannot find that the buyer's alleged obligation to pay post-shipment "freight" at port of destination, i.e., the charges for transporting the goods purchased, was intended also to obligate the buyer to pay for demurrage charges charged to the charterer by the vessel for any delay in unloading, irrespective of whose fault caused the delay upon which the demurrage charges were based, whether that of the charterer, the buyer, or the seller. No functional reason is assigned for such a bizarre intent. In the ordinary usage of the terms to be expected in a contract between a buyer and a seller, the charges for "freight" are so conceptually distinguishable from any charges for "demurrage" as to negative any intent that any liability for "freight" ipso facto included a liability for "demurrage" that may contractually have been imposed upon a third party by reason of that party's contract with yet another person foreign to the buyer's and the seller's contract.
 
 
 15
 Mineral's argument that Commonwealth's contractual responsibility for "unloading" costs included "demurrage", advanced without supporting authority, is close to frivolous.
 
 Responsibility for the Delay
 
 16
 The essential cause of the delay upon which the demurrage charges were based was the inadequate documentation of the cargo, which was on the high seas when purchased by Mineral and resold by it to the buyer Commonwealth. When the cargo arrived at the port of destination, the master refused to discharge the vessel because he had been given neither the bills of lading nor, in lieu thereof, a letter of indemnification from the charterer --a requirement for release of the cargo under the terms of the charter party between the vessel and the third-party charterer. Because of delays encountered by Mineral in transferring the bills of lading to Commonwealth, the latter did not tender the bills of lading to the vessel until five days after it was docked. For this delay (beyond the 36 hours permitted by the charter party), the vessel collected demurrage from the third-party charterer, by reason of the terms of the charter party between them.
 
 
 17
 Both the bankruptcy and the district courts held that the cause of this delay was due to the seller Mineral's inadequate documentation of the cargo.
 
 
 18
 Mineral contends, however, that the inadequate documentation by it was in actuality caused by the buyer Commonwealth's several failures to comply with contractual obligations between the two parties. Mineral principally contends that its own delay in furnishing the bills of lading to Commonwealth was in fact caused (a) by Commonwealth's unseasonable delay in tendering a letter of credit to be used in financing the sale and resale of the cargo, and (b) by Commonwealth's erroneous incorporation within the terms of the letter of credit of conditions not justified by the contract of sale between the parties.[5] We find little merit to these contentions.
 
 
 19
 Under a standard "cost and freight" clause (see note 1) incorporated by reference into the telex-confected contract between the two parties, the seller Mineral was required to furnish the buyer a "clean negotiable bill of lading for the port of destination." Mineral was unable to do so until five days after the ship had docked.
 
 
 20
 Mineral's delay had resulted from complications in its back-to-back financing arrangements. Mineral had intended to pay the third party (from whom it had bought the cargo and resold it to Commonwealth) by means of a letter of credit obtained from its own bank. However, to secure its own bank for the issuance of the letter of credit to it, Mineral intended to use a letter of credit in its favor from Commonwealth. Commonwealth itself could not obtain a letter of credit from its bank until it presented bills of lading for the cargo. These bills of lading could not be obtained by Commonwealth until after they had been transferred (1) from the original seller to Mineral and (2) then transferred by Mineral to Commonwealth to accomplish its resale of the cargo to Commonwealth.
 
 
 21
 The contract between Commonwealth and Mineral did not provide a time within which Commonwealth was to furnish its letter of credit to Mineral. Commonwealth did not do so until six days after Mineral's demand for it. The record evidence supports the factual conclusion that Commonwealth's tender of its letter of credit was seasonably made under the circumstances.
 
 
 22
 The record also supports the finding of the bankruptcy court that inadequate timely documentation by Mineral was the primary cause of the delay.[6] The court noted evidence of discrepancies by Mineral in furnishing requisite supporting documents of title, such as the absence of a cargo manifest (necessary for computation of taxes, not cured by Mineral before the date of delivery of the bills of lading). The initial delays in issuing the letter of credit (to Mineral and to Commonwealth)--in order to effectuate the ultimate delivery of clean bills of lading to Commonwealth--stemmed from the necessity that Mineral's letter of credit (to the third-party on-seas seller of the cargo) had to comply with any terms of the contract between it and the third party original seller, while Commonwealth's letter of credit had to--but could not--conform with Mineral's letter of credit in favor of that third party (which was based on acceptance of the certificate of quality issued at load port).
 
 
 23
 The initial contract of sale by Mineral to Commonwealth of ten cargoes of naphtha had specified that a certificate of inspection by Mineral's designation of inspector at loading port would be binding and final. However, the modification of this initial contract by the present contract for sale and resale of the present cargo naphtha, already at sea, involved cargo that had been inspected at the loading port by a designee of other than Mineral, and there was a discrepancy between the quality of the cargo certified to at the port of loading (in Romania) and that found upon subsequent testing of it at a stop in Greece. Therefore, in opening its letter of credit with its bank, Commonwealth had requested its issuance to be conditioned upon the seller (Mineral) furnishing a certificate of quality to reflect specifications at the port of destination and a certificate of inspection there, because of the possibility of contamination (since some of the vessel's cargo tanks had not been accessible for inspection in Greece due to inert gas on the tanks)--requirements found, non-clearly erroneously, by the district court to be reasonable, under the factual circumstances of the case. Commonwealth's bank required fulfillment of these requirements before it would issue a letter of credit in favor of Mineral. Mineral had refused to provide this additional documentation.
 
 
 24
 The ultimate contractual responsibility of the seller Mineral to furnish clean bills of lading at the port of destination placed upon it the primary responsibility to furnish, timely, bank-required documentation necessary to conclude the back-to-back financing that Mineral had initiated and utilized to effectuate the multiple transactions in question. The use of back-to-back letter-of-credit financing operations may, indeed, as here, foreseeably result in hiatus or delay because the issuing banks may require strict compliance, see Philadelphia Gear Corporation v. Central Bank, 717 F.2d 230, 234-36 (5th Cir.1983), with their respective and sometimes differing letter-of-credit requirements. See Berman and Kaufman, The Law of International Commercial Transactions, 19 Harv. Int'l L.J. 221, 249-50 (1978). In this instance, these delays are attributable to Mineral, the seller utilizing the back-to-back device, which failed to furnish documentation reasonably required by or on behalf of the buyer, Commonwealth.
 
 Conclusion
 
 25
 For the reasons stated, we AFFIRM the judgment of the district court.
 
 
 26
 AFFIRMED.
 
 
 
 [1]
 These provisions were included in the telex-confected contract between the parties through incorporation by reference to "Incoterms 1953" (i.e., Incoterms 1953, International rules for the interpretation of trade terms, International Chamber of Commerce, Paris), specifically the "C & F" (costs and freight) terms, pp. 28-32
 
 
 [2]
 The Lake Galera, supra, heavily relied upon by the seller Mineral in its argument, and its use of the "extended freight" concept, is totally inapposite to present issues
 The issue in the cited decision concerned whether the libelling vessels had lost their right to recover demurrage from the consignees by the failure of the vessels to insist upon their lien for demurrage and the unconditional delivery of the cargo to the consignees. The court rejected the consignees' contentions and awarded the demurrage charges to the vessels' owners, concluding that liability for the demurrage is "impose[d] upon a person receiving cargo, when the bills of lading provide that the consignee and his assigns shall pay freight or demurrage (which is extended freight)." 60 F.2d at 879. (Emphasis added.)
 In Lake Galera, the charter parties for the three vessels provided that "demurrage" was to be paid by the charterer or his agent (i.e., not by the vessel). 60 F.2d at 877, 879. By the bills of lading issued by the charterers to two of the consignees, they had agreed to be jointly and severally liable with the charterer for demurrage charges. 60 F.2d at 878. The bill of lading issued to the third consignee provided that "[f]reight and all conditions" of the Charter Party should control, id., and the charter party provided that " '[d]emurrage ... shall become a lien upon the cargo and shall be collectible in the same manner as the freight money' ", 60 F.2d at 879, i.e., from the consignee.
 The issue before us is readily distinguishable. We are not, as in Lake Galera, concerned with a dispute between a vessel and the consignee as to the liability as between them for demurrage. Instead, we are here concerned with the meaning of "freight" in a contract between a buyer and seller; specifically, whether the buyer's liability for "freight" as allegedly provided by that contract also included any liability of either party to the charterer for "demurrage" charges owed by it to the vessel, under the charter party between the charterer and the vessel. Unlike Lake Galera, further, we do not have before us a situation where the bill of lading or other contract between the parties in litigation specifically regulated responsibility for demurrage charges.
 
 
 [3]
 This dictionary as an alternate meaning also refers to the more specialized use of the term upon which the seller Mineral relies: "Demurrage is extended freight and is the amount payable by receiver in loading or unloading cargo; it is stipulated damages for detention." Black's Law Dictionary, supra, 389. The decision cited by the dictionary in support of this definition concerned a dispute between the consignees and the owner of the vessel; the vessels' claims for demurrage were rejected because of "no demurrage" clauses in the freight contracts between the two. Hellenic Lines, Ltd. v. Director General of India Supply Mission, 319 F.Supp. 821, 831 (S.D.N.Y.1970). The use of the "extended freight" concept was thus in the context of vessel-consignee liability for demurrage, a concept inapposite to the present contractual issue as between a buyer and a seller
 
 
 [4]
 This dictionary also refers an alternative meaning of demurrage to the more specialized use of the term, see note 2, supra: "It is an extended freight to the ship in compensation for earnings it is compelled to lose." deKerchove, supra, at 310 (emphasis added)
 
 
 [5]
 Mineral makes several other arguments in this respect, such as that Commonwealth was responsible for two days of the delay by the physical fulfillment of its requirement for an inspection of the vessel (see text infra ), which in the event physically took about two hours, Transcript, p. 42, and that, even absent tender by Mineral to Commonwealth of the bills of lading, the consignee Commonwealth was legally obliged to receive the cargo, a contention supported by no apposite authority. We note and reject without discussion these untenable contentions. See also note 6 infra for another untenable contention by Mineral
 
 
 [6]
 Without discussion, we will simply say that the bankruptcy court correctly concluded that Commonwealth had no contractual obligation to furnish a letter of indemnification to the vessel, i.e., in order to permit the discharge of the cargo in the absence of the bills of lading. The obligation was on the charterer, and, although Mineral possibly assumed it, neither the contract nor the record evidence support a conclusion that Commonwealth, the buyer, was obligated to furnish a letter of indemnification. Nor was the bankruptcy court clearly erroneous in accepting Commonwealth's testimony and rejecting Mineral's as to the custom of the trade or of the contract between the parties as being for the charterer, not the consignee, to furnish such letter