### FRENCH REPUBLIC v. FAHEY et al.

(District Court, D. Maryland. March 16, 1922.)

1. **Admiralty ⬅12—May award damages against consignee, who accepts cargo from ship.**

   Admiralty may award, against a consignee who accepts cargo from a ship, damages for any wrongful detention of it irrespective of whether the respondent was or was not an original party to the bill of lading or other contract of carriage.

2. **Admiralty ⬅12—One selling goods, and contracting with ship to load them on her bound by a maritime undertaking.**

   One who sells goods, and enters into a contract with a ship to load them on her, becomes bound to her for an undertaking maritime in its nature.

---

⬅For other cases see same topic & KEY-NUMBER in 'all Key-Numbered Digests & Indexes

**3. Admiralty ⬦12—Held not to have jurisdiction in action against seller.**

Where a foreign country purchased grain f. o. b. ship Baltimore, and notified sellers of its liability for demurrage, if they did not load a ship chartered by it within a certain time, but the sellers never at any time made any agreement with the ship, admiralty had no jurisdiction of a proceeding against the sellers to recover the demurrage paid.

In Admiralty. Libel by the French Republic against John T. Fahey and others, doing business as John T. Fahey & Company. Libel dismissed.

Janney, Stuart & Ober, of Baltimore, Md., and Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City, for libelant.

R. E. Lee Marshall, of Baltimore, Md., for respondents.

ROSE, District Judge. In March and April of 1920, the French Republic bought, and the respondents, Baltimore grain dealers, sold, some thousands of tons of rye, f. o. b. ship Baltimore. The buyer was to send a vessel or vessels for the grain, which the sellers were to deliver not later than the 31st of July, 1920. The price was to be paid in Paris, upon presentation of draft there with the usual shipping documents. The buyer hired a ship to carry the rye across the Atlantic, and by the terms of its charter party the vessel was—

"to be loaded according to berth terms, with customary berth dispatch, and if detained longer than five days, Sundays and holidays excepted, the charterer was to pay demurrage at the rate of $1 United States currency per net registered ton per day, and pro rata, payable day by day as incurred."

When, in conformity with the terms of the contract with the sellers, the buyer sent word to them that the ship was ready for loading, it also in effect told them that, if there was delay in the delivery of the grain, they would have to pay this demurrage. As it turned out, it was well on into August before the respondents delivered the rye to the ship, and in consequence the buyer became liable to the vessel for a demurrage bill of upwards of $40,000, and now seeks in this admiralty proceeding to recover from the sellers.

The sellers deny that they owe anything, asserting that they are protected by the strike clause of their contract, and they further insist that, whatever may be the relative rights of the parties, admiralty has no jurisdiction over the controversy between them. In their view, they were merely sellers of merchandise, and there was nothing maritime about the bargain they made. The circumstance that the buyer wanted the grain transported by water did not alter the essential nature of the agreement.

[1] The libelant relies on a number of cases, some of which state the now scarcely disputable principle that admiralty may award, against a consignee who accepts cargo from a ship, damages for any wrongful detention of it, and that irrespective of whether the respondent was or was not an original party to the bill of lading or other contract of carriage. Brooks v. Hilton Dodge Lumber Co., 229 Fed. 708, 144 C. C. A. 118; Sprague v. West, 22 Fed. Cas. 970, No. 13,255.

[2] There is no room for question that one who sells goods, and

enters into a contract with a ship to load them upon her, has become bound to her for an undertaking maritime in its nature. Melloy v. Lehigh & Western Coal Co. (D. C.) 37 Fed. 377.

[3] In the instant case, the sellers never at any time made any agreement with the ship. The notice as to the rate of demurrage sent them by the buyer was considered by them, not as changing the nature of their original contract, but merely as calling their attention to the special damage which the buyer would suffer from postponed delivery, and for which it would seek reimbursement from them. In view of the sellers' thorough knowledge of the practices of the export grain trade, it is likely enough that the buyer was right as to the applicable measure of damage recoverable, assuming that the contract was in fact broken; but, even so, an original nonmaritime contract of purchase and sale does not become maritime merely because the buyer may be entitled to recover from the seller a sum which it had to pay because the default of the sellers in their nonmaritime undertaking caused it, in its turn, to break a maritime engagement.

The exception to the jurisdiction of the court of admiralty must be sustained, and, as the reform of pleading and practice has not yet gone far enough to permit a transfer of the case to the law side of the court, the libel must be dismissed.