## ASHCRAFT–WILKINSON CO., Inc., v. UNITED STATES.

Circuit Court of Appeals, Fifth Circuit.
January, 7, 1929.

Rehearing Denied January 28, 1929.

No. 5200.

George L. Buist, of Charleston, S. C., and Marion Smith, of Atlanta, Ga. (Buist & Buist, of Charleston, S. C., and Little, Powell, Smith & Goldstein, of Atlanta, Ga., on the brief), for appellant.

C. P. Goree, Asst. U. S. Atty., of Atlanta, Ga., and H. F. Birnbaum, Sp. Asst. U. S. Atty., of New York City (Clint W. Hager, U. S. Atty., of Atlanta, Ga., on the brief), for the United States.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

FOSTER, Circuit Judge. In this case appellee filed a libel in personam against appellant to recover demurrage in the amount of $11,453.12 for delay in unloading the steamship Vittorio Emmanuele III, owned by appellee, alleged to have been caused by the default of appellant. The District Court found both at fault and, presumably on the theory of dividing the damages, awarded judgment for $5,012.50. Appellant seeks a complete reversal, and appellee asks for an amendment of the judgment to allow the full amount claimed.

The record is not very satisfactory, and the evidence is somewhat vague and inconclusive, due no doubt to a delay of about six years in taking the testimony. However, the following statement of facts is not in dispute:

The Steamship Vittorio Emmanuele III, of 3,600 tons net register, arrived in the port of Savannah, Ga., on March 2, 1920, loaded with a cargo consisting of 2,600 tons of kainit in bulk and 4,480 bags of muriate of potash of a gross weight of 402 tons, a total of 3,002 tons of cargo, and was entered at the custom house at 1:50 p. m. on that day. Under the terms of the charter, the charterer had 24 hours thereafter to designate a berth, and the ship was ordered to the dock of the Central of Georgia Railroad, berth No. 25 or 26. At first she was placed outside of another vessel, but moved into the wharf at 7 a. m. on March 3d and began discharging her cargo about 8 a. m., which was the usual time for stevedores at Savannah to begin work. The charter provided that the steamer should employ charterer's and consignee's stevedore for discharging the cargo, at the usual rates at the port of discharge; the stevedore to be considered as a direct servant of the steamer, the work to be done under the direction and supervision of the master, and the cargo to be taken from alongside the vessel at charterer's risk and expense. The charter further provided that the cargo should be discharged at the rate of not less than an average quantity of 550 tons per weather working day, if detained longer, demurrage to be paid at the rate of $1 per ton, net register, for every day so detained, which was over four times the ship's daily gross earnings on the voyage. Appellant was the holder of bills of lading for the cargo, but was not the charterer of the vessel, and had no knowledge of the provisions of the charter until long after the ship had been discharged. Prior to the arrival of this cargo, the rate of discharge usually stipulated was 300 tons per day and the demur-

rage was four pence sterling. These rates had originally been printed in the charter, but had been erased and the higher rates inserted. Under the charter provisions, the lay days expired on March 10, 1920, and the discharging of the cargo was not completed until March 13, 1920. Demurrage was claimed for a period of 3 days, 1 hour, and 40 minutes.

In the view we take of the facts, it is unnecessary to discuss the questions presented as to whether appellant was bound by the terms of the charter and liable in personam. It may be conceded that a prima facie case for appellee was made out by showing delay, and that the burden of rebutting this was on appellant.

Appellant contends that the entire delay in unloading the ship was caused by the breaking down of the ship's hoisting apparatus, the failure of the vessel to maintain sufficient steam for its proper operation, and the dilatoriness of the stevedores in prosecuting the work. Appellee contends that failure of the vessel to unload more promptly was caused by a shortage of freight cars in which the cargo was to be loaded directly from the ship.

The evidence is conflicting as to the extent of the breaking down of the ship's winches and the furnishing of a sufficiency of steam, but there could be no doubt that there was considerable delay from both of these causes. However, it appears that the wharf had two levels that could be used at the same time and was fitted with hoisting machinery that could have been used in aid of that on the vessel in discharging on the upper level, from where a conveyor could have moved the cargo into storage bins or cars. The ship was equipped with five hatches, and could have unloaded from all five at the same time if the unloading equipment was in good working condition and a sufficient number of men had been employed. There was no scarcity of stevedores at Savannah. Only 437 tons of cargo were discharged overhead. The balance was discharged on the lower level. Part of the time only two hatches were working, part of the time, three, sometimes four, but never five at the same time. It was usual to store cargo in the sheds, and the wharf was equipped with bins for the storage of

kainit with ample capacity to have accommodated the entire cargo of the ship. There is some conflict in the testimony as to whether the railroad would have allowed discharging at night, but we may safely assume that it would have been permitted had it been requested, as the witness Barry, who was the railroad agent in charge of the terminals, so testifies. The charter provided that the ship could discharge at night at her expense. In unloading the cargo it was dumped on the wharf at the end of the ship's tackle and was then taken away by the railroad labor in trucks and loaded into cars. There was no shortage of trucks or labor on the wharf. The cars into which the cargo was loaded came down on the wharf on tracks running at right angles to the water front. The total delay shown by not having cars ready was 40 minutes at hatch No. 1, $3\frac{1}{2}$ hours at hatch No. 2, 35 minutes at hatch No. 4, and 1 hour and 20 minutes at hatch No. 5. This was spread over the entire unloading time. The captain testified the ship could have discharged from 800 to 1,200 tons per day. Had she been worked at full capacity, the slight delay occasioned by not having cars ready could have been easily made up. But no attempt was made to do this, and no effort was made to discharge on the wharf or into the storage bins. On March 3, there were no delays of any kind, and only about 200 tons were discharged. On March 9, with no delays, only 340 tons were unloaded. On the facts just stated, the burden imposed on appellant has been sustained.

It was the duty of consignee to assign a proper berth to the vessel and receive the cargo as tendered. There was no default in this respect. On the other hand, it was the duty of the ship to make use of the capacity and facilities of the wharf and to discharge and tender the cargo at the rate stipulated. The ship was responsible for any deficiency of her equipment and any insufficiency or incompetence of stevedores, and was in default in not making full use of the facilities of the wharf. In the circumstances disclosed, demurrage was not incurred. U. S. v. Sugarland Industries (C. C. A.) 296 F. 913; The Hans Maersk (C. C. A.) 266 F. 806.

Reversed, with instructions to dismiss the libel.