## THE S. S. HARTISMERE.

### ROBERTS v. NORTH NEGROS SUGAR CO., Inc., et al.

#### No. 2146.

District Court. D. Maryland.
March 18, 1937.

Ritchie, Janney, Ober & Williams, of Baltimore, Md., for libelant.

768

Venable, Baetjer & Howard, of Baltimore, Md., for charterers and Cargo.

George Ross Veazey, of Baltimore, Md., for American Sugar Refining Co.

COLEMAN, District Judge.

In this case the master of the British Steamer Hartismere has filed a libel for demurrage, or damages for detention, and also for wharfage in connection with her unloading, against the charterer and some 500 tons of raw Philippine sugar, constituting a part of that vessel's cargo of 8,400 tons, delivered to the American Sugar Refining Company at its dock in Baltimore, between August 12 and August 22, 1936. The charterer has impleaded the American Sugar Refining Company, to which the cargo was sold ex-ship Baltimore, and which acted as stevedore in the unloading of the vessel.

The pertinent provision of the charter party is that the vessel should be discharged "as customary, with all dispatch for steamers." Libelant complains of delay in her discharge, and says that the charterer is liable therefor. The charterer and the impleaded American Sugar Refining Company take the position that the vessel was discharged in entire accordance with the terms of the charter party and the custom of the Port of Baltimore, and that, therefore, no demurrage is due. The charterer further says that if there is any liability, it should be upon the American Sugar Refining Company, the purchaser, receiver, and the one that unloaded the cargo.

Libelant contends that with due diligence and reasonable skill the cargo could and should have been discharged at the rate of 1,500 tons per working day of eight hours, that is, 300 tons per hatch, per working day of eight hours, or at the rate of 37½ tons for a gang per hour; whereas the charterers, as well as the impleaded purchaser of the cargo, contend that the customary rate of discharge in Baltimore is 700 tons per weather working day; but libelant, in turn, denies the existence of any such custom. There is still an additional defense on the part of respondents that the master waived any right to require the cargo to be discharged with any greater dispatch, by acquiescing in advance, through written correspondence, in what was done; and also by his failure to make formal demand for damages until August 18th. But I fail to find any facts sufficient to constitute a waiver or estoppel.

Although the pertinent clause of the charter party has already been quoted, it might be well to quote the entire passage or paragraph, which embraces the quotation already made. It relates to both the loading and unloading of cargoes, and is as follows: "An average of 500 tons per weather working lay days, Sundays and holidays excepted, are to be allowed the said merchants for loading, such days to commence on the master giving twenty-four hours' notice in writing of the steamer being ready to load, but not to commence prior to 11th May next, if so required by charterer's agent, and fifteen days of demurrage at 50 per day, and to be discharged as customary, with all dispatch for steamers. Time occupied in shifting to ports not to count as lay days."

I might say at the outset that were it a matter of first impression, I would incline to the view that in the clause, "to be discharged as customary, with all dispatch for steamers," the words, "as customary," relate only to the method, and not also to the time of unloading. However, I believe that the weight of authority in this country, if not, indeed, in England also, seems to be contrary to this, the more narrow construction. A good review of the law is to be found in the case of Steamship Company of 1912 v. C. H. Pearson & Son Hardware Company (C.C.A.) 30 F.(2d) 770, and in Carver, "Carriage of Goods by Sea," §§ 614 and 615, in so far as the British law is concerned.

Therefore, on that theory, that is, adopting what I understand to be the weight of authority, although, as I say, somewhat contrary to my own view as to the better construction of such a clause, a great deal of testimony was allowed to be introduced with respect to what, if any, custom exists at the Port of Baltimore, as to the amount of time allowed for loading, or, in other words, as to the rate, in tons, per day, or any other standard for unloading.

After hearing such testimony, and all other testimony bearing upon the means adopted, and the time employed in the present case for unloading, I feel that an unreasonable amount of time was consumed, approximately nine full working days. Libelant claims that approximately half of that amount would have been sufficient had the hatches been worked more completely, and had not the convenience of the American Sugar Refining Company been so much the predominant factor in unloading.

I believe this argument is sound. Without going into the details of the number of gangs that were employed on each of the days, suffice it to say that on only two days were three gangs worked, although the boat had four holds and five hatches. It is also significant that on two days 1,000 tons were discharged; on another day, 1,100 tons, and on another as many as 1,301 tons, which latter is only a little under what libelant claims would be a fair average, namely, 1,500 tons, and what the testimony shows is not far in excess of what frequently has been unloaded from other vessels carrying Philippine sugar to the Port of Baltimore. The average in the present case was only 908.5 tons per day. The fact that a lower loading rate (here it is only 500 tons) is stipulated may, in some cases, be strong evidence of what is a reasonable rate of discharge of the same cargo. But not so here, with the respective conditions, facilities, etc., so different.

The main argument made on behalf of the respondents is that the storage facilities did not permit of more rapidity in unloading. I do not think that is a sufficient excuse under the circumstances, because the removal of this handicap was something entirely within the control of the one doing the unloading, namely, the sugar company.

█ As to custom, I take the true rule to be this; custom which is not a negligent one may often justify a given course of conduct, but no custom will justify an unreasonable practice. What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonableness, whether it usually is complied with or not.

█ It seems to me that the custom which is relied upon in the present case, i. e., a standard for discharge of 700 tons per weather working day, is unreasonable, not only because it is shown to be confined to virtually one plant here in Baltimore, i. e., that of the sugar company, by reason of the fact that the plant has substantially all of the business in this particular type of cargo, but also because, as I view the testimony, even granted such custom may have been reasonable when put into effect, it is no longer reasonable for meeting all current conditions and needs.

I am not impressed with the fact that this custom has not heretofore been put in litigation, or with the fact that it has been acquiesced in generally in ports along the

Atlantic Seaboard and the Gulf, and that but very little demurrage has been paid under it. The fact remains that under it the company which unloads the cargo has the benefit of a one-sided, unfair arrangement, taking into account what can be done, and what is rather commonly done with respect to unloading cargoes of this kind. In other words, to speak in the vernacular, it seems to be a case of "heads, I win, tails, you lose." The company unloading says, in effect, "If necessary to justify tardy discharge, we will invoke the so-called custom, otherwise not. It is not to be treated as a standard for working efficiency, but rather as a business convenience."

The evidence that the practice is old, not merely in Baltimore, but all along the Atlantic Seaboard, limiting the amount to 700 tons per day, is not sufficiently persuasive to overcome the fact that, whatsoever may have been true of the past, the present requires more expeditious stevedoring. I take the case to be quite similar to that of a freight rate or passenger rate which a common carrier may have had in effect for years, but which, for a number of reasons, has never been tested by litigation and nullified. Sooner or later its unreasonableness must be determined. I believe the situation here calls for an interpretation of this practice; and on the evidence, on the statements of the representatives of the sugar company itself, it seems to me self-evident that this vessel could have been, and should have been, in fairness to the vessel owners, released in approximately the time that is contended for. But I agree with the charterer that if liability is to be imposed in this case, it is ultimately to be met by the sugar company, as purchaser, because that company had the right, under the terms of the purchase to control, and did control, the place and the character of the unloading. This seems to be firmly established by such cases as Brooks v. Hilton-Dodge Lumber Co. (C. C.A.) 229 F. 708, 709, and French Republic v. Fahey (D.C.) 278 F. 947.

█ However, when we come to the question of recovery, I reach the conclusion that there should be no recovery allowed in this case for demurrage, because no proof of actual damage due to the detention has been shown, which I think is a prerequisite. I reach this conclusion for the following reasons. It is to be noted, in the clause of the charter party already quoted, that there is no stipulated rate of demurrage with respect to unloading, that is to say,

such stipulation as there is, precedes the clause relating to unloading, namely, "and to be discharged as customary, with all dispatch for steamers," and obviously relates to the question of loading, provision for which immediately follows the statement about the demurrage rate.

It has been urged upon me that this location of the clause in question makes no difference,—that the rate is applicable to either loading or unloading. Even if we assume that his latter construction is sound, I still believe that, by the weight of authority and by the better reasoning in a case of this kind, there should be no recovery unless actual damage is proven. And this is said quite independently of the last provision in the charter party which reads, "Penalty for non-performance of this agreement, proved damages," because I construe the "non-performance" there referred to, as total failure to perform, that is, failure ever to begin.

I have been referred to only one case which supports libelant on this precise point, the case of Randall v. Sprague (C.C.A.) 74 F. 247, in the First Circuit. It is true that case expressly says that in a clause quite akin to the one that we have before us, the stipulated demurrage rate relates both to loading and unloading. However, the law in the First, Ninth, and Fifth Circuits appears to be clearly to the effect that even where the stipulated rate of demurrage is surrounded with no doubt as to its application, there can be no recovery unless there is proof of actual damage. Those cases are, in the First Circuit, New York & New England Railroad Company v. Church (C.C.A.) 58 F. 600, in the Ninth Circuit, Dewar v. Mowinckel (C.C.A.) 179 F. 355, and in the Fifth Circuit, The Colombia (D.C.) 197 F. 661, affirmed in (C.C.A.) 199 F. 990.

It is true that in the Second Circuit, in the case of Bailey v. Manufacturers' Lumber Co. (D.C.) 224 F. 806, the reasoning would appear to be contrary to what has just been stated, but the facts in that case are so different, as I interpret them from the published opinion, from those in the present case, that I am not willing to use it as controlling authority.

Without quoting, therefore, from these cases, but adopting, as I feel I must, the view that, where the stipulated rate of demurrage is not expressly made to apply to unloading, we must see whether there has been any actual damage, and turning to the facts on that point, it appears that when the Hartismere left Baltimore she proceeded to Houston, Tex., for loading under a charter party dated June 5, 1936, which provided that her lay days for loading should not count before September 1, 1936, unless with charterer's written consent, and that she arrived in Houston, and gave notice of readiness to load on August 31st, and actually started loading on September 1st, the very beginning of the lay days named in the charter. From those facts it is self-evident that the detention caused no actual loss; and I find nothing in the testimony of the witnesses which would tend to vary the necessary implication from the facts which I have just summarized.

 There remains to be considered the question of wharfage charges, and whether libelant is entitled to have any of these charges abated, at the rate of $26.95 per day, the reasonableness per se of this rate not being disputed.

Concluding, as I do, that the vessel should have been discharged in four and a half or five and a half working days, or seven running days, and she having been charged by the American Sugar Refining Company wharfage for ten running days, I find that the charge should have been for only seven running days, and that therefore the master should recover from the sugar company the charge for the three extra days at $26.95 per day, or $80.85. Wharfage is not provided for in the charter party. Liability for it, therefore, depends simply upon whether the vessel was, in fact, held an unreasonable length of time, akin to the rule for a malum prohibitum.

A decree will be signed in accordance with this opinion.