**TRANS–ASIATIC OIL LTD., S.A., Plaintiff,**

v.

**APEX OIL COMPANY, Defendant.**

**Civ. No. 83–0339 GG.**

United States District Court, D. Puerto Rico.

Dec. 13, 1985.

Santiago, Pérez, Bermúdez & Bruno, San Juan, P.R., for plaintiff.

Pedro Santa Sánchez, O'Neill & Borges, Hato Rey, P.R., for Apex Oil.

Luis A. Lugo, Jr., San Juan, P.R., for P.R. Elec. Power Authority.

## ORDER

GIERBOLINI, District Judge.

This is an action to recover a series of demurrage charges which plaintiff, Trans-Asiatic Oil Limited, S.A. (Trans-Asiatic) claims are due and owing to it by defendant, Apex Oil Company (Apex). Jurisdiction is alleged under Title 28, United States Code, § 1333.

The trial of this case was held on April 30 and May 2, 1985, at which time both parties presented testimonial and documentary evidence. Shortly thereafter, the parties filed post-trial legal memoranda and proposed findings of fact and conclusions of law.

### I

After a careful evaluation of all the documentary and testimonial evidence on record, and the briefs filed by both parties, we find the following:

On February 24, 1983, plaintiff Trans-Asiatic, a Panamanian corporation with its principal place of business in Israel, filed a verified complaint against Apex, a partnership established in the State of Missouri with its principal place of business in St. Louis, Missouri.

Pursuant to Rule B of the Supplemental Rules for Certain Adminiralty and Maritime Claims of Federal Rules of Civil Procedure, Trans-Asiatic garnished certain monies owed to Apex by the Puerto Rico Electric Power Authority in order to secure the six claims for demurrage contained in the complaint. The third, fourth, fifth and sixth claims for relief in plaintiff's verified complaint were settled prior to trial. The remaining claims for relief are pled under alternative theories of recovery. The first claim for relief is based on the Tanker Voyage Charter Party of January 6, 1983, entered into by Telstar Maritime, Inc. of Monrovia (Telstar), a Liberian corporation, with GHR Energy Corporation (GHR) as charterer. The second claim for relief is based on the Bill of Lading of January 14, 1983, for certain Laguna crude oil transported by the vessel SEA ROVER.

On January 6, 1983, Telstar, as registered owner of the SEA ROVER, entered into a voyage charter party with GHR as charterer. Neither Trans-Asiatic nor Apex were parties to the Tanker Voyage Charter Party of January 6, 1983, for the SEA ROVER. The charterer of the vessel SEA ROVER was GHR, pursuant to the Charter Party of January 6, 1983. In the provisions regarding demurrage, the charter party provides that the charterer shall pay demurrage. Under the charter party in question, Telstar was the party entitled to claim demurrage.

Pursuant to the terms of this first charter party, GHR ordered the SEA ROVER to the Port of Puerto Miranda, Venezuela, in order to load a cargo of Laguna crude oil. The loading at this port began on January 12, 1983 and concluded on January 14, 1983. A total of 32 hours 35 minutes laytime accrued to the vessel at the load port, but there was no demurrage.

On or about January 25, 1983, Apex purchased the cargo of Laguna crude oil carried onboard the SEA ROVER from Occidental Crude Sales (Occidental). Pursuant to the agreement between Apex and Occidental the cargo of Laguna crude oil was to be delivered to Apex in Guayanilla, Puerto Rico through deviation of the SEA ROVER.

GHR continued to guarantee payment of freight and due fulfillment of charter party terms and conditions. GHR also agreed to indemnify *Telstar* for any damages which may have arisen due to the delivery of the cargo to Apex. Charges for freight, deviation or related costs were included in the price charged Apex by Occidental, of $21.99 per barrel. Apex was liable to Occidental for any demurrage resulting from its actions or omissions during discharge in Guayanilla, Puerto Rico.

The second claim asserted by Trans-Asiatic is based on a bill of lading which does not provide for demurrage nor does it incorporate any of the terms of the charter party with respect to demurrage. On or about January 26, 1983, Trans-Asiatic was informed of the bankruptcy of GHR and consequently learned that GHR would not make payment owed on the freight in question. Concurrently, Trans-Asiatic learned that Apex was receiving the cargo of the SEA ROVER; based on this information, Trans-Asiatic gave instructions to the master of the vessel and to its representatives in Guayanilla, Puerto Rico to not allow the SEA ROVER to berth and make delivery of its cargo to Apex until Trans-Asiatic gave its authorization.

Trans-Asiatic informed Apex by telex that payment of freight was to be made "before breaking bulk" and that by virtue of the lien on the cargo there would be no discharge prior to payment of freight deviation and other charges due or to become due under the charter party. Trans-Asiatic required Apex to pay the freight owed by GHR in the amount of $439,297.06 before it would allow the SEA ROVER to discharge its cargo.

On January 27, 1983 Apex paid, under duress, $390,229.06 in freight charges to Trans-Asiatic. From the amount demanded, Apex deducted the sum of $49,038.00 which represented money owed by Trans-Asiatic to GHR for bunker oil supplied to the vessel SILVER LADY. Pursuant to an agreement between GHR and Trans-Asiatic, GHR was entitled to a deduction of $49,038.00 from any payments made to Trans-Asiatic under the Tanker Voyage Charter Party. Thus, when Trans-Asiatic received $390,229.06, it had obtained all the money it was owed by GHR for freight and deviation charges for the SEA ROVER.

Trans-Asiatic then sought payment of the $49,038.00 withheld by Apex and refused to allow the discharge of the cargo until it received the monies in question. Again under duress, Apex paid the additional sum requested on January 31, 1983. Upon receipt of the $49,038 from Apex, Trans-Asiatic received more monies from Apex then it was to have received from GHR, the charterer.

In order to facilitate delivery of the cargo without presentation of a bill of lading, Apex instructed Banque Paribas, the holder of the bill of lading, to issue and deliver

to Trans-Asiatic a letter of indemnity on Apex's behalf which was countersigned by said bank agreeing to indemnify Trans-Asiatic against ... "ALL LOSS, COSTS (INCLUDING COST AS BETWEEN ATTORNEY OR SOLICITOR AND CLIENT) DAMAGES AND EXPENSES, WHICH YOU OR ANY OF YOU MAY SUFFER OR BE PUT TO BY REASON OF THE DELIVERY OF THE SAID GOODS TO US OR TO OUR ORDER." The letter of indemnity makes no reference to demurrage. The indemnity expired and was cancelled by Banque Paribas upon delivery of the cargo and return of the bill of lading.

The discharge of the SEA ROVER was delayed from the time of tending her Notice of Readiness on January 27, 1983, at 0948 hours until 1735 hours on January 31, 1983, awaiting instructions from Trans-Asiatic to authorize discharge of the cargo. On February 1, 1983 from 1830 hours to February 2, 1983 at 2030 hours, discharge was delayed due to sampling cargo oil and analyzing the sample at shore.

Once the discharge of the cargo commenced, the pumping operation of the vessel SEA ROVER was unduly slow. The ship had a discharge capacity of 27,000 barrels of oil per hour, yet it was only pumping 5,000 barrels per hour. Also, the stripping portion of the discharge, that is, the pumping of the oil at the bottom of the container was very slow. Further delays occurred as a result of the master's failure to follow instructions concerning discharge from the wing and center tanks and the temperature of the cargo.

Protests concerning the vessel's failure to maintain the temperature of the cargo and for having an excess of free water in the cargo tanks were communicated to the master.

Based on the foregoing, we must find that once the vessel proceeded to berth, there were certain delays in the discharge which cannot be attributed to Apex. Moreover, there is no evidence that Trans-Asiatic suffered any damages as a result of the delay in the unloading of the vessel SEA ROVER. The SEA ROVER's voyage to Guayanilla, Puerto Rico was its last commercial voyage, and upon completion of this voyage, the SEA ROVER was sold by its owner, Telstar. Therefore, the delay did not interfere with any subsequent obligations.

## II

As to the law applicable to these facts, we conclude that a charter party is a contract between the owner of a vessel and the charterer of that vessel and any such charter party is subject to all the rules and requirements of contract law. *Great Circle Lines, Ltd. v. Matheson & Co., Ltd.*, 681 F.2d 121 (2d Cir.1982); G. Gilmore & C. Black, *The Law of Admiralty*, § 4–1 at 195 (2d ed. 1975). As in contract law, a charter party can be enforced by the party entitled thereto under the contract against the party who appears to be bound under such contract.

Demurrage is the sum which is fixed by the contract of carriage, or which is allowed, as remuneration to the owner of a ship for the detention of the vessel beyond the number of days allowed by the charter party for loading and unloading. *Black's Law Dictionary*, p. 389 (5th ed. 1979).

In order to be entitled to collect demurrage, the carrier's right to demurrage must clearly appear in the contract of carriage although it can be implied. *Gulf Puerto Rico Lines, Inc. v. Associated Food Co., Inc.*, 366 F.Supp. 631 (D.C.P.R. 1973). Assuming *arguendo* that a legitimate claim for demurrage exists, the party entitled to bring such a claim would be Telstar Maritime, Inc. as the registered owner of the SEA ROVER.

Apex, as purchaser of the cargo on a delivered basis from Occidental, was neither charterer, sub-charterer nor assignee of the charterer for the vessel and the voyage in question. It had no rights or obligations pursuant to the Charter Party of January 6, 1983; therefore, no demurrage can be claimed against Apex under its terms.

■ Trans-Asiatic is not entitled to claim demurrage against Apex under the Bill of Lading of January 14, 1983. Liability for the demurrage is "impose[d] upon a person receiving cargo, when the bills of lading provide that the consignee and his assigns shall pay freight or demurrage (which is extended freight)." *Matter of Commonwealth Oil Refining Co., Inc.,* 734 F.2d 1079, 1081, n. 2 quoting *The Lake Galera,* 60 F.2d 876 at 879 (2d Cir.1932).

However, the bill of lading here does not make reference to either Trans-Asiatic or Apex, nor does it expressly provide for the payment of demurrage or expressly incorporate the provisions of the charter party regarding demurrage.

■ Notwithstanding the existence of a demurrage clause, such penalty can only be claimed if the shipowner can demonstrate that he has suffered actual damage as a result of the charterer's delay. Benedict *on Admiralty,* Vol. 2B, § 31 (1985). Demurrage will only be allowed when profits have actually been or may be reasonably supposed to have been lost and the actual loss is proven. *Skou v. United States,* 478 F.2d 343, 345 (5th Cir.1973); *D'Amico v. Mediterranean Pacific Line, Ltd.,* 1975 A.M.C. 98 (N.D.Cal.1974). In the instant case, plaintiff failed to prove that it suffered any losses or damages as a result of the delays of the SEA ROVER. In fact, it was clearly established that there was no loss of profit, since the SEA ROVER had no further commercial voyages after it departed from Guayanilla, Puerto Rico and it was sold by the owner in March of 1983.

Moreover, Trans-Asiatic cannot claim demurrage for delays which resulted from its own actions and/or the actions of the master of the vessel. Thus, we conclude that plaintiff has failed to demonstrate that it is entitled to claim demurrage against Apex under either the Tanker Voyage Charter Party or the Bill of Lading.

Wherefore, in view of the above, it is ordered that the verified complaint be and is hereby dismissed with costs.

The clerk shall enter judgment accordingly.

SO ORDERED.