**TRANS–ASIATIC OIL LTD., S.A.,**
Plaintiff, Appellant,

v.

**APEX OIL COMPANY, et al.,**
Defendants, Appellees.

No. 86–1067.

United States Court of Appeals,
First Circuit.

Heard Sept. 4, 1986.

Decided Nov. 3, 1986.

Francisco G. Bruno with whom Jorge Carazo Quetglas and Sweeting Gonzalez & Cestero, Hato Rey, P.R., were on brief for plaintiff, appellant.

Pedro J. Santa-Sanchez with whom Jorge I. Peirats and O'Neill & Borges, Hato Rey, P.R., were on brief for defendant, appellee Apex Oil Co.

Before BOWNES and TORRUELLA, Circuit Judges, and CARTER,* District Judge.

BOWNES, Circuit Judge.

■ Plaintiff-appellant Trans-Asiatic Oil Ltd., S.A. appeals a judgment by the United States District Court for the District of Puerto Rico holding that appellant had failed to prove that it was entitled to recover demurrage [1] against appellee Apex Oil

---

* Of the District of Maine, sitting by designation.

1. Demurrage is a penalty imposed on a charterer of a vessel, or in some instances the consignee of the vessel's goods, for delays in loading or unloading the ship's cargo. The period of time permitted under the charter party for loading and unloading is known as "laydays" or "lay- time." After the agreed laydays have expired, the charterer—or sometimes, the consignee—is liable for delay according to an agreed daily or hourly rate of liquidated damages known as demurrage. See 2B A. Jenner & J. Loo, *Benedict on Admiralty* § 31, at 2–1 (7th ed. 1986).

Company. *Trans-Asiatic Oil Ltd., S.A. v. Apex Oil Co.*, 626 F.Supp. 718 (D.P.R. 1985).

Trans-Asiatic had filed its complaint in accordance with Rule B(1) of the Federal Rules of Civil Procedure Supplemental Rules for Certain Admiralty and Maritime Claims.[2] Pursuant to this rule, the District Court of Puerto Rico issued an order attaching approximately $324,000 owed to Apex by the Puerto Rico Electric Power Authority. On appeal by Apex, we upheld the constitutionality of the B(1) attachment procedure, *Trans-Asiatic Oil Ltd., S.A. v. Apex Oil Co.*, 743 F.2d 956 (1st Cir.1984), and remanded the case to the district court. This appeal follows the trial on the merits below.

THE FACTS

■ Trans-Asiatic is a Panamanian corporation with its principal place of business in Israel. In 1978, Trans-Asiatic operated a fleet of twenty-three oil tankers as part of its worldwide marketing of crude oil from the Middle East. The vessel, SEA ROVER, was purchased and registered in the name of Telstar Maritime, Inc., a Liberian corporation formed and jointly owned by a Trans-Asiatic subsidiary in partnership with a ship manager. Telstar's sole

revenue came from Trans-Asiatic, which leased the SEA ROVER for a monthly rate of charter hire in accordance with the terms of a ten-year time charter party dated December 14, 1978.[3] Under this arrangement, Trans-Asiatic controlled the SEA ROVER's operation and employment, and earned the vessel's freight and demurrage revenues.

Trans-Asiatic explained that the tense situation in the Middle East necessitated shielding the SEA ROVER from identification with Israel; Arab oil-producing nations had begun to boycott Israeli-operated vessels. Accordingly, in order to prevent the vessel from being linked to a corporation closely associated with Israel, Trans-Asiatic decided to subcharter the SEA ROVER in the name of Telstar, rather than its own name.

On January 6, 1983, Telstar entered into a voyage charter party with GHR Energy Corporation. Consistent with its wish to keep the SEA ROVER from being associated with Israel, Trans-Asiatic was not named on the tanker voyage charter party. It did, however, negotiate the terms of the agreement, and one of its employees signed the charter party on behalf of Telstar. Apex was not a party to the voyage charter

**2.** Rule B(1) provides:
**RULE B. Attachment and Garnishment: Special Provisions**
(1) *When Available; Complaint, Affidavit, Judicial Authorization, and Process.* With respect to any admiralty or maritime claim in personam a verified complaint may contain a prayer for process to attach the defendant's goods and chattels, or credits and effects in the hands of garnishees to be named in the process to the amount sued for, if the defendant shall not be found within the district. Such a complaint shall be accompanied by an affidavit signed by the plaintiff or his attorney that, to the affiant's knowledge, or to the best of his information and belief, the defendant cannot be found within the district. The verified complaint and affidavit shall be reviewed by the court and, if the conditions set forth in this rule appear to exist, an order so stating and authorizing process of attachment and garnishment shall issue. Supplemental process enforcing the court's order may be issued by the clerk upon application without further order of the court. If the plaintiff or his attorney certifies that exigent circumstances

make review by the court impracticable, the clerk shall issue a summons and a process of attachment and garnishment and the plaintiff shall have the burden on a post-attachment hearing under Rule E(4)(f) to show that exigent circumstances existed. In addition, or in the alternative, the plaintiff may, pursuant to Rule 4(e), invoke the remedies provided by state law for attachment and garnishment or similar seizure of the defendant's property. Except for Rule E(8) these Supplemental Rules do not apply to state remedies so invoked.

**3.** A time charter party is a contract between a vessel owner and charterer whereby the charterer pays the owner a fixed monthly sum for the use of the vessel during the period covered by the charter. A voyage charter party is an agreement in which the vessel owner, or the disponent owner under a time charter party, collects freight in exchange for providing the services of the ship to a merchant for the transportation of cargo on a determined voyage to one or more places.

party, which listed GHR as charterer of the SEA ROVER. GHR had purchased 418,-000 barrels of Laguna Crude Oil and thereafter sold the oil to Occidental Crude Sales (OCS). OCS was designated a subcharterer of the SEA ROVER, but GHR expressly agreed to guarantee payment of freight and fulfillment of the charter party terms and conditions.

While the SEA ROVER was en route to GHR's refinery in Good Hope, Louisiana, OCS sold the crude on board to Apex. In the course of ordering the SEA ROVER to divert to Guayanilla, Puerto Rico, for discharge, GHR reiterated its responsibility under the terms of the charter party. And, on January 21, 1983, GHR expressly agreed to indemnify the SEA ROVER's owners for any loss or damages that might be incurred in delivering the cargo to Apex in Guayanilla.

The district court found that Apex agreed to purchase the Laguna Crude from OCS in Guayanilla for $21.99 per barrel, which included charges for freight, deviation and related costs. The terms of the sale between Apex and OCS provided that Apex would be liable for demurrage incurred at Guayanilla. Apex argued, and the district court found, that it had agreed to be liable only to OCS for any demurrage caused by its own actions in Guayanilla.

On January 25, 1983, the same day that Apex and OCS solidified the terms of their crude oil transaction, GHR was sent an invoice totalling over $439,000. This sum represented the total freight and deviation costs of transporting the SEA ROVER's cargo to Puerto Rico. On January 26, 1983, Trans-Asiatic learned that GHR was close to filing for bankruptcy and that it would be unable to pay for the freight and deviation costs it owed to Trans-Asiatic under the charter party. The charter party specifically provided that freight costs were to be paid "before breaking bulk"— that is, before discharge of the cargo. Thus, when the SEA ROVER arrived in Guayanilla on the morning of January 27, it was apparent to Trans-Asiatic that GHR would be unable to fulfill its obligation under the charter party to pay freight costs before unloading the cargo. Trans-Asiatic, therefore, instructed the master of the vessel by telex not to release the cargo, as Trans-Asiatic was "asserting its lien on the cargo for freight, deviation and all other charges due from charterer, GHR Energy Corp." Trans-Asiatic then informed Apex that discharge would be delayed until it received full payment of freight and deviation costs.

On January 27, 1983, Apex paid $390,-229.06 in freight charges to Trans-Asiatic. Apex had deducted $49,038, which represented money owed by Trans-Asiatic to GHR for bunker oil supplied to another vessel in Trans-Asiatic's fleet. Trans-Asiatic had agreed to allow GHR to deduct this sum from any freight costs it might incur. Thus, Apex availed itself of a credit GHR could have taken had GHR made the freight payments. The $390,229.06 paid by Apex represented all that Trans-Asiatic would have been entitled to receive from GHR.

Nevertheless, Trans-Asiatic, insisting that the bunker fuel credit arrangement solely involved itself and GHR, demanded payment of the additional $49,038. Discharge of the Laguna Crude was withheld until January 31, when Apex acceded to Trans-Asiatic's demand and paid the additional $49,038. On January 31, 1983, Apex also instructed Banque Paribas to issue and deliver to Trans-Asiatic a letter of indemnity. This letter was sent to facilitate cargo discharge without presentation of the bill of lading. The letter's cosignors, Apex and Banque Paribas, agreed to indemnify Trans-Asiatic against "all loss, costs (including cost as between attorney or solicitor and client) you or any of you may suffer or be put to by reason of the delivery of the said goods to us or our order." The district court specifically noted that the letter of indemnity made "no reference to demurrage." 626 F.Supp. at 721. The court further found that the terms of the letter expired upon delivery of the cargo and return of the bill of lading.

Even after the freight payments were made and the letter of indemnity was received by Trans-Asiatic, further discharge delays ensued. The district court found that these delays could not be attributed to Apex.[4] In addition, the court found no evidence that Trans-Asiatic had suffered any damages due to the delays in unloading the SEA ROVER's cargo. The Guayanilla voyage was the SEA ROVER's last commercial venture and, upon its completion, the vessel was sold by Telstar.

ANALYSIS

The issues we consider are: (1) whether the appeal is moot because the district court lost jurisdiction when it dissolved the attachment; (2) whether Apex is liable to Trans-Asiatic for demurrage under the voyage charter party, bill of lading or contract of sale between Apex and OCS; and (3) whether Trans-Asiatic must show actual damages in order to recover on a demurrage claim.

*Jurisdiction*

On December 23, 1985, the district court entered judgment against Trans-Asiatic. Trans-Asiatic failed to move for a stay of the judgment and did not request a supersedeas bond until after the expiration of the ten-day automatic stay of Rule 62(a) of the Federal Rules of Civil Procedure.[5] On January 9, 1986, Apex filed a motion for dissolution of the attachment and release of the garnished funds. Trans-Asiatic did not oppose Apex's motion. On January 21, 1986, Trans-Asiatic filed a timely notice of appeal to this court. On January 31, 1986, the district court granted Apex's motion and ordered that the attached funds be surrendered to Apex. Subsequently, Trans-Asiatic filed a motion for reconsideration of the district court's order and for permission to post a supersedeas bond to stay the judgment pending appeal. After the district court denied this motion, Trans-Asiatic filed an emergency motion in this court requesting a stay of the judgment pending appeal. We denied Trans-Asiatic's motion, noting that it had neither moved for a stay nor offered to file a supersedeas bond within the ten-day limit imposed by Rule 62(a).

Apex contends that the attachment obtained pursuant to Rule B(1) constituted the sole basis of the district court's jurisdiction and, therefore, release of the security renders this appeal moot, because the departure of the garnished funds leaves nothing remaining upon which the jurisdiction of this court, or the court below, can attach. Trans-Asiatic counters that the dissolution of the attachment is immaterial because Apex has consented to *in personam* jurisdiction.

The same basic issue was confronted recently by the Ninth Circuit in *Teyseer Cement Co. v. Halla Maritime Corp.*, 794 F.2d 472 (9th Cir.1986). Teyseer sued Halla for damages resulting from the sinking of a ship chartered by Halla which was carrying cement owned by Teyseer. Jurisdiction was obtained pursuant to Rule B(1);

---

4. Trans-Asiatic urges that the district court incorrectly approached the issue of which entity caused the delays. It argues that the risks and vicissitudes of delay lie with the consignee absent specific exonerating clauses in the charter party, fault attributable to the shipowner, or a *vis major* amounting to a sudden and unforeseen interruption. *Shipping Corp. of India Ltd. v. Sun Oil Co.*, 569 F.Supp. 1248 (E.D.Pa.1983); *United States v. Atlantic Refining Co.*, 112 F.Supp. 76 (D.N.J.1951). We need not assess the propriety of the district court's approach to this issue, since we affirm the decision on other grounds.

5. Rule 62(a) provides:

**Rule 62. Stay of Proceedings to Enforce a Judgment**

(a) **Automatic Stay; Exceptions—Injunctions, Receiverships, and Patent Accountings.** Except as stated herein, no execution shall issue upon a judgment nor shall proceedings be taken for its enforcement until the expiration of 10 days after its entry. Unless otherwise ordered by the court, an interlocutory or final judgment in an action for an injunction or in a receivership action, or a judgment or order directing an accounting in an action for infringement of letters patent, shall not be stayed during the period after its entry and until an appeal is taken or during the pendency of an appeal. The provisions of subdivision (c) of this rule govern the suspending, modifying, restoring, or granting of an injunction during the pendency of an appeal.

the District Court for the Western District of Washington attached another ship owned by Halla. Thereafter, the district court, relying on a foreign court selection clause in the bill of lading, dismissed the action for improper venue and then released the attachment. After losing a motion for reconsideration, Teyseer filed a timely appeal. Teyseer never sought a stay of the order releasing the attachment, nor did it file a request to post a supersedeas bond. On appeal, the Ninth Circuit dismissed the case as moot, holding that the release of the security rendered the district court powerless to impose a judgment in the event of a remand by the appellate court.

The Ninth Circuit initially analogized the Rule B(1) attachment procedure to maritime *in rem* proceedings commenced to arrest a vessel pursuant to Rule C of the Federal Rules of Civil Procedure Supplemental Rules for Certain Admiralty and Maritime Claims. The *Teyseer* court determined that in an action undertaken pursuant to Rule C, the plaintiff must obtain a stay of the execution of the judgment because release of the vessel renders moot an appeal of the lower court's judgment.[6] *Teyseer Cement Co.*, 794 F.2d at 475. The Ninth Circuit recognized that the analogy between Rule C and Rule B only carries so far, since an attachment under Rule B can be obtained only "with respect to any admiralty or maritime claim *in personam*." *Id.* at 476 (quoting Rule B(1)). The *Teyseer* court, however, found that a writ of attachment issued pursuant to Rule B(1) "does not itself confer *in personam* jurisdiction over any party." 794 F.2d at 476 n. 5.

Rather than characterize Rule B(1) actions as purely *in personam*, the *Teyseer*

court aligned itself with other authorities which regard a B(1) proceeding as *quasi in rem*. *Id.* at 477; *Belcher Co. v. M/V Maratha*, 724 F.2d 1161, 1164 (5th Cir.1984); *Maryland Tuna Corp. v. MS Benares*, 429 F.2d 307, 311 (2d Cir.1970); *Engineering Equipment Co. v. S.S. Selene*, 446 F.Supp. 706, 709 n. 9 (S.D.N.Y.1978); *East Asiatic Co., Ltd. v. Indomar Ltd.*, 422 F.Supp. 1335, 1341–42 (S.D.N.Y.1976). Accordingly, the court held:

> When the sole basis of jurisdiction over a defendant is *quasi in rem*, the court derives its jurisdiction over the defendant solely from its authority over the attached property or its substitute security. Once that property or its substitute security is released, the court has no jurisdiction over the defendant.

*Teyseer*, 794 F.2d at 477.

■ Although both *Teyseer* and the matter before us involve the identical legal issue of whether dissolution of a B(1) attachment renders moot any subsequent appeal, the two cases differ with respect to one key factor. The defendant-appellee in *Teyseer* only entered a limited appearance. Halla never appeared generally nor was there a trial on the merits. In the instant case, appellee Apex initially entered a limited appearance to challenge the constitutionality of the B(1) attachment proceeding. After this court upheld the constitutionality of the B(1) procedure, a pretrial order was issued by the court below stating that "[t]here is no dispute between the parties that the Court has jurisdiction over the parties and the subject matter of this action." Apex acquiesced to this language in the pretrial order without jurisdictional reservation, appeared generally, and defended the claim fully on the merits.[7] Thus, while

---

6. The *Teyseer* court relied solely on Ninth Circuit authority in support of this proposition. *Aleyska Pipeline Service Co. v. Vessel Bay Ridge*, 703 F.2d 381, 384 (9th Cir.1983), *cert. dismissed*, 467 U.S. 1247, 104 S.Ct. 3526, 82 L.Ed.2d 852 (1984); *American Bank of Wage Claims v. Registry of the District Court of Guam*, 431 F.2d 1215, 1218 (9th Cir.1970). As discussed below, there is authority from other circuits holding that release of the vessel in a Rule C *in rem* action does not moot an appeal. *See, e.g., United*

*States v. An Article of Drug Consisting of 4,680 Pails*, 725 F.2d 976 (5th Cir.1984).

7. The *Teyseer* court noted that "when the defendant has been served with process or has entered a general appearance, the presence or absence of the attached property is irrelevant to the question of the court's personal jurisdiction over the defendant." *Teyseer Cement, supra*, 794 F.2d at 477; *United States v. An Article of Drug, supra*, 725 F.2d at 982. Indeed, some of

appellee's initial entry of a restricted appearance manifested its lack of consent to personal jurisdiction, Apex's actions after remand constituted a waiver of its jurisdictional defenses. We do not hold that Apex's general appearance automatically nullified its jurisdictional defenses. We hold only that Apex's consent to the language in the pretrial order amounted to a waiver of its jurisdictional reservation.

■ We note also that the underlying purpose of the Rule B attachment procedure is to facilitate the adjudication of admiralty claims. The Fifth Circuit has held, in the course of resolving a Rule C action, that "when a legal fiction which exists solely to effectuate the adjudication of disputes is invoked for the opposite purpose, we have no hesitation in declining to employ it." *United States v. An Article of Drug Consisting of 4,680 Pails,* 725 F.2d 976, 983 (5th Cir.1984); *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel,* 569 F.2d 330, 334 (5th Cir. 1978). Thus, in some *in rem* actions where the underlying res was outside the jurisdiction of the court, the Fifth Circuit has dispensed with the fiction that its jurisdiction over the matter wholly depended on the location of the res. Instead, the Fifth Circuit has held that "owners who appeared in an *in rem* action to contest plaintiff's claims may equitably be treated as if they had been brought into court by personal process." *United States v. An Article of Drug,* 725 F.2d at 983. The treatise writers also have recognized that a court's jurisdiction in a maritime attachment proceeding may not be wholly circumscribed by the presence and amount of the attachment:

> Attachment, unlike in rem arrest, serves the function of providing the court with a type of in personam jurisdiction over the absent defendant. Since the insulation afforded by the restricted appearance applies to "other claims" that may be asserted against that defendant, it could

well be argued that the defendant's appearance to defend that already asserted claim should subject him to the full potential consequences of that suit—including a duty to pay any portion of the in personam judgment that exceeds the value of the property attached by the suit.

7A J. Moore & A. Pelaez, *Moore's Federal Practice* ¶ E16[2] at E–790 (2d ed. 1986). We have no intention of eroding the boundaries between *in rem* and *in personam* jurisdiction, or *quasi in rem* and *in personam* jurisdiction. Because of Apex's consent to the language in the pretrial order, and because of our hesitancy to construe Rule B(1) in a hypertechnical manner that would frustrate its adjudicative purpose, we hold that this court does have jurisdiction to hear this matter and that Trans-Asiatic's appeal is not moot.

### Apex's Liability for Demurrage

Trans-Asiatic urges that Apex should be held liable for demurrage under the terms of the voyage charter party, under the bill of lading, or under the terms of the contract of sale with OCS.

■ The charter party was signed by Telstar and GHR. The district court concluded that since Apex was neither a charterer, subcharterer nor assignee of the charterer of the SEA ROVER's January 6, 1983, voyage, it could not be held liable for demurrage under the charter party signed by Telstar and GHR. We see no reason to disturb this holding. We are not persuaded by Trans-Asiatic's assertion that Apex's conduct somehow brought it within the purview of the obligations of the charter party. Apex neither agreed to assume, nor actually held, the rights and obligations of the charterer under the charter party. GHR never abrogated or assigned its duties as charterer. In fact, even after it was learned that the SEA ROVER would be diverted to Guayanilla, GHR reaffirmed its obligations under the voyage charter

the authorities cited in *Teyseer,* which characterize the B(1) proceeding as *quasi in rem,* acknowledge that such characterization may be inappropriate when the defendant has made an

appearance. *See East Asiatic Co., Ltd. v. Indomar, Ltd.,* 422 F.Supp. 1335, 1342 n. 4 (S.D.N.Y. 1976); 7A J. Moore & A. Pelaez, *Moore's Federal Practice* ¶ B.03, at B–103 n. 6 (2d ed. 1986).

party. Moreover, GHR expressly agreed to indemnify the owners of the SEA ROVER for any losses or damages incurred while delivering the cargo to Apex. Furthermore, in the same letter promising to indemnify Trans-Asiatic, GHR reasserted its status as charterer of the SEA ROVER. Indeed, Trans-Asiatic obviously still regards GHR as obligated by the terms of the charter party, since it has sought to recover the entire demurrage amount claimed herein from GHR in its bankruptcy proceeding. In short, we find no basis upon which to hold Apex liable to Trans-Asiatic for demurrage under the voyage charter party.

■ Trans-Asiatic also argues that the court below erred in not holding Apex liable for demurrage under the bill of lading. Generally, liability for demurrage can be "impose[d] upon a person receiving cargo, *when the bills of lading provide that the consignee and his assigns shall pay freight or demurrage.*" *Matter of Commonwealth Oil Refining Co., Inc.*, 734 F.2d 1079, 1081 n. 2 (5th Cir.1984) (emphasis supplied) (quoting *The Lake Galera*, 60 F.2d 876, 879 (2d Cir.1932)); *see also The Arzipa*, 63 F.2d 42, 44 (4th Cir.1933). The bill of lading herein makes no reference to demurrage. Trans-Asiatic perhaps could recover from Apex under the bill of lading had that document incorporated the voyage charter party, which does contain provisions for demurrage. *See Crossman v. Burrill*, 179 U.S. 100, 109, 21 S.Ct. 38, 41, 45 L.Ed. 106 (1900); *Son Shipping Co. v. DeFosse & Tanghe*, 199 F.2d 687, 688 (2d Cir.1952); *Yone Suzuki v. Central Argentine Railroad*, 27 F.2d 795 (2d Cir.), *cert. denied*, 278 U.S. 652, 49 S.Ct. 178, 73 L.Ed. 563 (1928); *Larsen v. A.C. Carpenter, Inc.*, 620 F.Supp. 1084, 1108 (E.D.N.Y.1985). But the bill of lading here does not incorporate the terms of the charter party.

Both parties cite different sections of the passage noted below from *Crossman v. Burrill*, 179 U.S. 100, 21 S.Ct. 38, as dispositive authority for their respective positions:

The bills of lading, as already mentioned, provide only for "paying freight for said lumber as per charter party dated 7th March, 1893 and average accustomed." They do not mention demurrage, or refer to any provisions of the charter, other than those concerning freight and average. It is well-settled that a bills of lading in such a form does not subject an indorsee thereof, who received the goods under it, to any of those other provisions of the charter. It does not give him notice of, or render him liable to, the specific provisions of the charter, which require a discharge of a certain quantity of lumber per day, or, in default thereof, the payment of a specific sum for a longer detention of the vessel; but he is entitled to take the goods within a reasonable time after arrival, and is liable to pay damages for undue delay in taking them, according to the ordinary rules of law which govern in the absence of specific agreement.

*Id.* at 109, 21 S.Ct. at 41. Apex claims that the quoted passage underscores its contention that demurrage liability cannot be imposed under the bill of lading unless that document expressly so provides or incorporates the charter provisions that so provide. Trans-Asiatic stresses that the last half of the final sentence in the passage buttresses its claim for recovery. We do not believe that *Crossman* stands for the proposition that a consignee, who is not a party to the charter agreement, can be held liable for demurrage under a bill of lading that refers neither to demurrage nor to a document containing provisions for demurrage. Indeed, the Court stated that a shipowner's rights against consignees who were not charterers "depended altogether on the contract created by the bills of lading, except so far as that contract referred to the charter party." 179 U.S. at 110, 21 S.Ct. at 41. The Court went on to note that "[i]t would be a wide stretch to hold that by this language of the bill of lading, which plainly refers *only* to the provisions of the charter party as *to freight money*, a consignee would become liable to demurrage if he accepted the cargo under such a bill."

*Id.* (emphasis added) (quoting *Dayton v. Parke,* 142 N.Y. 391, 400, 37 N.E. 642 (1894)). We rule that Apex cannot be held liable for demurrage under the bill of lading.[8]

■ As the authorities cited indicate, courts have been reluctant to impose demurrage liability on a party that is neither a signatory, successor nor possessor of a document that expressly or by incorporation refers to demurrage. Nevertheless, Trans-Asiatic contends that the demurrage obligations undertaken by Apex in its contract of sale with OCS render Apex liable to Trans-Asiatic for demurrage. The district court found that the contract of sale provided that Apex was liable only to OCS for any demurrage that could have accrued in Guayanilla. Trans-Asiatic avers that the district court's position runs afoul of the holding in *Amerada Hess Corp. v. S.S. Phillips, Oklahoma,* 558 F.Supp. 1164 (S.D.N.Y.1983). The consignee in *Amerada Hess* disclaimed liability for demurrage on the basis that it was not a party to the charter agreement and that such agreement was not incorporated into the bill of lading. Nevertheless, the district court held the consignee liable because "[i]ts contract of sale with the Shipper expressly provides that demurrage shall be paid *to the carrier* in accordance with the charter party between the Shipper and the carrier." 558 F.Supp. at 1169–70 (emphasis added). The contract of sale between OCS and Apex differs from the one involved in *Amerada Hess* in two respects. First, the *Amerada Hess* court found that the sale contract made express reference to the demurrage provisions in the charter party between the shipper and carrier. The sale agreement between OCS and Apex does not mention the charter party between GHR and Telstar. Second, the district

court in *Amerada Hess* found that the contract of sale provided that demurrage shall be paid "to the carrier." In the instant case, the district court concluded that Apex obligated itself for demurrage only to OCS. We do not consider this finding to be clearly erroneous, especially in light of the fact that GHR was still bound by the provisions of the charter party, even after the oil was sold by OCS to Apex. Since GHR was already liable to Trans-Asiatic for demurrage pursuant to the charter party, it seems sensible that Apex would not, without expressly so indicating, bind itself similarly to Trans-Asiatic in an agreement made solely with OCS.

■ Finally, we reject Trans-Asiatic's argument that Apex can be held liable for demurrage under the letter of indemnity cosigned by Apex and Banque Paraibas. As the district court noted, the letter of indemnity does not even mention demurrage. We are also unpersuaded that Apex's payment to Trans-Asiatic of freight and deviation costs renders it liable for demurrage. The district court found that Apex made such payments under duress. There is ample support for this conclusion. Apex never agreed with Trans-Asiatic to pay freight and deviation costs. GHR never repudiated or delegated its obligation to pay such costs. Trans-Asiatic was entitled to keep the cargo on board the SEA ROVER until such costs were paid. The news of GHR's imminent bankruptcy indicated that the party obliged to pay freight and deviation costs would be unable to do so. Thus, Trans-Asiatic exercised its right under the charter party to withhold discharge of the cargo. Trans-Asiatic's action severely jeopardized Apex's ability to fulfill its obligation to deliver the 402,000 barrels of oil to the Puerto Rico Power Authority.

---

8. Trans-Asiatic cites several old district court cases in support of its position that demurrage can be claimed against Apex even absent an express or incorporated reference thereto in the bill of lading. *United States v. Ashcraft-Wilkinson Co.,* 18 F.2d 977 (N.D.Ga.1927); *Crowley v. Hurd,* 172 F. 498, 500–01 (D.Mass.1906); *The M.S. Bacon v. The Erie & Western Transportation Co.,* 3 F. 344 (W.D.Pa.1880). In *M.S. Bacon,*

unlike the instant case, the consignee was a party to the contract of affreightment. Similarly, in *Crowley,* the consignee signed the charter party. *Crowley v. Hurd,* 172 F. at 502. The district court's decision in Ashcraft subsequently was reversed by the Fifth Circuit. *Ashcraft-Wilkinson Co. v. United States,* 29 F.2d 961 (5th Cir.1929).

Apex was faced with the choice of refusing to pay approximately $400,000 in freight costs, or jeopardizing a sale involving over $8 million worth of crude oil. We have little difficulty upholding the finding that its decision to pay was a choice made under duress.

### Necessity of Proving Actual Damages

Trans-Asiatic's claim for demurrage also founders because it failed to show that it suffered any actual damages from the detention of the SEA ROVER. This failure results from the fact, already mentioned, that this was the last voyage taken by the SEA ROVER before it was sold by Telstar.

There are a number of cases holding that "[d]emurrage will only be allowed when profits have actually been, or may be reasonably supposed to have been, lost, and the amount of such profits is proved with reasonable certainty." *Skou v. United States*, 478 F.2d 343, 345 (5th Cir.1973) (citing *The Conqueror*, 166 U.S. 110, 125, 17 S.Ct. 510, 516, 41 L.Ed. 937 (1898)); *Compania Pelineon de Navegacion v. Texas Petroleum Company*, 540 F.2d 53, 55 (2d Cir.1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977); *The Nicolaou Maria*, 143 F.2d 406 (5th Cir.1944); *Lykes Brothers Steamship Co. v. Waukesha Bearings Corp.*, 524 F.Supp. 195 (E.D.La.1981). Trans-Asiatic seeks to distinguish these cases on the grounds that they involved delay caused by collision or faulty maintenance work. It agrees that actual damages must be shown in such an instance. Trans-Asiatic contends, however, that the situation differs when the demurrage reflects an excess of the number of days provided for shipping and unloading in a charter agreement. In that case, it argues, no actual damages need be shown since the stipulated rate in the charter agreement stands as the parties' agreed-upon measure of damages resulting from loading or unloading delays.

 We do not agree that the mere stipulation of a liquidated sum for demurrage in a charter agreement obviates the need to show actual damages. "Despite the existence of a demurrage clause, ... such penalty can only be claimed if the shipowner can demonstrate that he has suffered actual damage as a result of the charterer's delay." 2B *Benedict on Admiralty*, § 31, at 2–1, 2–2 (1986).[9] Demurrage compensates a vessel owner "for freight *it has lost* because the vessel was not free when the parties agreed it would be." *Shipping Corp. of India Ltd. v. Sun Oil Co.*, 569 F.Supp. 1248, 1255 (E.D.Pa. 1983) (emphasis added). It is, therefore, appropriate to require the vessel owner to prove that freight has, indeed, been lost, or that damages actually have been suffered. *D'Amico v. Mediterranean Pacific Line, Ltd.*, 1975 A.M.C. 98 (N.D.Cal.1974); *The S.S. Hartismere*, 18 F.Supp. 767, 770 (D.Md.1937); *The Colombia*, 197 F. 661 (S.D.Ala.), *aff'd, Rasmussen v. Home Industry Iron Works*, 199 F. 990 (5th Cir. 1912) ("To enforce the contract as claimed by appellant, without proof of actual damages, would be inequitable, permitting the appellant to enrich himself at the expense of appellee.").

The burden of proof imposed on a vessel owner claiming demurrage is not excessive:

> It is not necessary for him to show by direct evidence that he would have employed his vessel ... during the period in such a way that earnings would have accrued to him.... It suffices if he shows a state of facts from which a court or jury can find that there was an opportunity to do so, and that he would have availed himself of it.

*Skou v. United States, supra*, 478 F.2d at 346 (quoting *The North Star*, 151 F. 168, 175 (2d Cir.1907)).

 Here, Trans-Asiatic failed to proffer any evidence to comply with this relatively light burden of proof. Apex, on the

---

9. Of course, the requirement of proving actual damages does not vitiate the demurrage rate stipulated in a charter agreement or bill of lading, unless such a rate is so excessive that it constitutes a penalty. *See, e.g., Bailey v. Manufacturers' Lumber Co.*, 224 F. 806 (S.D.N.Y. 1915); *The Colombia*, 197 F. 661 (S.D.Ala.), *aff'd*, 199 F. 990 (5th Cir.1912).

other hand, proved that this voyage was the SEA ROVER's last commercial voyage for Trans-Asiatic and that the vessel was sold shortly thereafter. Trans-Asiatic offered no evidence to rebut this. The district court found that "it was clearly established that there was no loss of profit...." 626 F.Supp. at 722. We agree.

*Affirmed.* Costs to appellee.